**OCOEE RIVER COUNCIL, et al.**

v.

**TENNESSEE VALLEY AUTHORITY.**

**No. CIV–1–81–100.**

United States District Court,
E. D. Tennessee, S. D.

June 9, 1981.
On Renewed Motion for Summary
Judgment June 3, 1982.

---

Charles H. Warfield, Farris, Warfield & Kanaday, Nashville, Tenn., for plaintiffs.

Herbert S. Sanger, Jr., Gen. Counsel, James E. Fox, Assoc. Gen. Counsel, Justin M. Schwamm, Sr., Asst. Gen. Counsel, Robert C. Glinski, Melvin R. Harper, T.V.A., Knoxville, Tenn., for defendant.

## MEMORANDUM

FRANK W. WILSON, Chief Judge.

This is an action against the Tennessee Valley Authority (TVA) to enjoin the construction of a hydroelectric power generation project. Jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1331 and is not in dispute. The plaintiffs are the Ocoee River Council, a non-profit corporation chartered under Tennessee law whose purpose is in part to promote the recreational uses of the Ocoee River; David Broemel, a citizen and resident of the State of Tennessee who uses the Ocoee River for private recreational purposes; and Sunburst Wilderness Adventures, Inc., a commercial rafting company which in its business uses the Ocoee River. The plaintiffs allege that the TVA should be enjoined from further work on the project because it is in viola-

tion of the following federal statutes: the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 et seq.; the Federal Water Pollution Control Act (the Clean Water Act), 33 U.S.C. §§ 1251 et seq.; the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq.; the Fish and Wildlife Coordination Act of 1958, 16 U.S.C. §§ 661 et seq.; and the Outdoor Recreation Act, 16 U.S.C. § 460l. A hearing was held upon the plaintiff's motion for a preliminary injunction upon April 15, 1981. The case is presently before the Court upon the motion for a preliminary injunction (Court File # 3) and the TVA's motion to dismiss, or, in the alternative, for summary judgment (Court File # 8). The foregoing motions are for decision by the Court upon the pleadings, affidavits and exhibits filed by the parties, and the briefs and oral argument of counsel.

## I—Background

The Ocoee is a tributary of the Hiwassee, which is itself a tributary of the Tennessee. The river originates in the Appalachians in Union County in north Georgia, where it is known as the Toccoa. It flows in a northwesterly fashion and enters Tennessee in its southeastern-most region, in Polk County, where its name changes to the Ocoee. The drainage area of the river above its confluence with the Hiwassee covers 639 square miles and includes land in Tennessee, Georgia and North Carolina. The first dam on the river, Ocoee No. 1, was constructed in 1911 by the Eastern Tennessee Power Company approximately 12 miles from the mouth of the river. Ocoee No. 2, at river mile 24.2, was completed in 1913, and the Blue Ridge, at river mile 53, was completed in 1930. The TVA acquired these projects in 1939 and built an additional dam, Ocoee No. 3, in 1942 at river mile 29.2.

Ocoee No. 2 is the subject of this litigation. The project consists of a rock-filled timber crib dam, which can divert the river into a wooden flume that leads to a powerhouse approximately four and one-half miles downstream. The powerhouse and dam are located in Polk County, Tennessee, on a stretch of the river that is adjacent to U. S. Highway 64. When operating, the project can produce approximately 17 megawatts of power. Considering fluctuations in the streamflow caused in part by the operation of the upstream Blue Ridge project, Ocoee No. 2 can operate at maximum about 90 per cent of the time and can yield an annual production of approximately 135 million kilowatt hours. According to the plaintiffs, this is approximately seven hundredths of one per cent of the total installed system generating capacity of the TVA.

In 1976, TVA inspections showed the steel support trestles of the flumeline were in an advanced stage of deterioration, causing a safety hazard. The project was shut down in September, 1976, and has remained so since. As a result, the Ocoee has been allowed to run its natural course along the streambed. The river now provides excellent whitewater recreational opportunities, including rafting, canoeing and kayaking. The Final Environmental Impact Statement prepared by the TVA notes that the scenic attributes of the Ocoee River Gorge, the proximity of the river to area population centers, and the direct accessibility via U. S. Highway 64, qualify the Ocoee as a premier whitewater recreation stream. Whitewater use of the river began in 1977 and the TVA has estimated that the river had approximately 7,000 recreational visits that year. Such use of the river has increased dramatically and the TVA has estimated that, if the Ocoee No. 2 project is retired, there would be 50,000 or more recreational visits to the river annually by the mid-1980's.

The TVA has decided to repair the project. Pursuant to the National Environmental Policy Act of 1969, a draft environmental impact statement (EIS) was prepared and made public on August 8, 1978. The draft EIS was sent to 21 federal, state or local agencies, 19 interest groups, and 135 individuals. A public hearing on the EIS was held upon October 2, 1978, and, after comments had been received, the TVA prepared a final EIS and released it upon July 25, 1979. The final EIS listed several alter-

natives with regard to the reconstruction of the project, including the possibility of its retirement. In the statement's summary, the TVA made the following observation:

"Based on an analysis of the costs and benefits, the projected recreational use, and the existing environment, TVA proposes to replace the trestles and the flume, reinforce the crib dam with rock fill, and provide special releases for recreation on weekends during the summer months."

Complaint, Exhibit 1, at 3 (hereinafter cited as "EIS"). The proposed construction alternative involved the complete restoration of the crib dam, the flume and the powerhouse. The recommended recreational alternative involved the release of water from the dam on 46 days a year from May 1 through September 30, consisting of all Saturdays, Sundays and national holidays. Annual power output from the project would be diminished somewhat, however. In this connection, the EIS stated:

"The proposed program of recreational releases *retains the majority of potential power and recreation benefits* and represents a reasonable accommodation of recreational interests in the context of power operation."

(EIS at 24–25 (Emphasis added). Applying a *multipurpose* benefit cost analysis, and not viewing the project in terms of only power generation, the EIS contained the following conclusion:

"As seen from the economic analysis . . ., [the recreational alternative of allowing scheduled releases] *provides maximization of overall benefits to the public from the standpoint of power and waterborne recreation.*" [1]

EIS at B–1.

Upon November 8, 1979, the TVA Board voted to rehabilitate the Ocoee No. 2 project. It decided not to adopt, however, the recreational alternative proposed in the final EIS. Instead, the Board voted to seek separate funding from Congress, in the form of a one-time five million dollar capital investment, to allow for 82 days of recreational releases annually. This decision was apparently the result of TVA's long-standing policy of requiring power consumers to pay only for the costs involved in producing power, but not the costs for serving recreation or other nonpower purposes. *See* TVA Annual Report—1979, Exhibit to TVA's Reply Memorandum, at 70. Congress rejected the appropriations request and suggested that the proposed recreational alternative be funded by the collection of user fees. H.R.Rep.No. 96–1093, 96th Cong., 2d Sess. 150 (1980).

In the instant action, the plaintiffs make several contentions. Initially, they contend that the TVA violated Section 102 of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332, by filing an inadequate environmental impact statement. The plaintiffs contend that the EIS is defective in that: (a) the final EIS circulated by the TVA showed plainly that there would be some recreational use of the river and did not mention that such use would be contingent upon separate Congressional funding or user fees; (b) the figures used in the benefit/cost ratio are incorrect; (c) the EIS fails to discuss the need for the reconstruction of the project in relation to TVA's present or potential overall capacity for the production of power; (d) there is no discussion of the cumulative effect of the elimination of this stretch of white water in connection with the elimination of other whitewater recreation areas; (e) there is no discussion of the environmental impact of the use of chromated copper arsenate to treat the wood in the flume; and, (f) the TVA failed to provide for interagency review and public comment on the proposal that the

---

1. Construction Alternative B in the EIS, which involved no recreational releases from the dam, provided for approximately $2.5 million in annual benefits derived solely from power production. Annual operating and maintenance costs were estimated to be approximately $290,000. Construction Alternative A provided for $2.41 million in annual power benefits and approximately $235,000 in recreational benefits. Annual operating and maintenance costs under this alternative entailed approximately $317,000. The EIS recommended Construction Alternative A.

TVA Board did, in fact, adopt. Secondly, the plaintiffs assert that the TVA failed to perform its statutory duty under NEPA to adequately consider the environmental impact of the Ocoee project in reaching its decision to not allow recreational releases of water absent separate Congressional funding. Thirdly, the plaintiffs contend that the TVA is subject to the provisions of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, and was required by that Act to obtain a permit from the Corps of Engineers in order to proceed with the reconstruction of the project and make any discharges into the river. The plaintiffs allege that the Corps issued such a permit to the TVA with a special condition, which specifically showed that the Corps understood that the river would be used for recreation upon completion of the project. The plaintiffs' fourth contention is that TVA's decision to rebuild Ocoee No. 2 without allowing for recreational releases absent additional funding was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" and may be set aside pursuant to the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* (APA). Finally, the plaintiffs contend that TVA's decision to reconstruct Ocoee No. 2 without assuring recreational uses is in contravention of the policy set out by Congress in the Outdoor Recreation Act, 16 U.S.C. § 460*l*.[2]

The TVA contends that its decision to allow for recreational use of the Ocoee only if there is a separate Congressional appropriation is a "power supply decision" and not subject to judicial review under NEPA or the APA; that no EIS was required for the *reconstruction* of an existing hydroelectric project; that, even if an EIS was required, there was no violation of NEPA because the EIS was adequate; that the Corps of Engineers' permit has not been violated; that the plaintiffs' claims are barred by laches; that the plaintiffs' claim regarding chromated copper arsenate is frivolous; that the Clean Water Act does

not apply to this action; that the Outdoor Recreation Act (Federal Water Project Recreation Act) does not apply to this action; and, finally, that there is no basis for an injunction.

## II—*The National Environmental Policy Act of 1969*

Section 4332 of Title 42, U.S.C., the primary operative provision of NEPA, provides, in relevant part, as follows:

§ 4332. *Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts.*

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) *all agencies of the Federal Government* shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) *identify and develop methods and procedures*, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, *which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations*;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

---

**2.** The plaintiffs have withdrawn their contentions that TVA's decision violates the Fish and Wildlife Coordination Act of 1958, 16 U.S.C.

§§ 661 *et seq.*, or the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 *et seq.*

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

\* \* \* \* \* \*

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

\* \* \* \* \* \*

(Emphasis supplied)

In *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460, 488 (1978), the Supreme Court stated that while NEPA

"... does set forth significant substantive goals for the Nation, ... its mandate to the agencies is essentially procedural.... Administrative decisions should be set aside in this context, as in every other, *only for substantial procedural or substantive reasons* as mandated by statute ... not simply because the court is unhappy with the result reached."

(Emphasis supplied). *See also Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433, 437–38 (1980). This Court's inquiry is limited, therefore, to the issue of whether the TVA "has considered the environmental consequences," and it may not "'interject within the area of discretion of the executive as to the choice of the action to be taken.'" *Strycker's Bay, supra,* 444 U.S. at 227–28, 100 S.Ct. at 499–500, 62 L.Ed.2d at 438. A further discussion of the scope of review of an agency's decision under NEPA was set out by the Court of Appeals for the District of Columbia in *Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission,* 449 F.2d 1109 (D.C.Cir.1971):

"Section 102 of NEPA [42 U.S.C. § 4332] mandates a particular sort of careful and informed decisionmaking process and creates judicially enforceable duties. The reviewing courts probably cannot reverse a substantive decision on its merits, under Section 101, unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values. But if the decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse. As one District Court has said of Section 102 requirements: 'It is hard to imagine a clearer or stronger mandate to the courts.'"

*Id.* at 1115.

■ Although the Supreme Court stated in both the *Vermont Yankee* and *Strycker's Bay* cases that the duties imposed upon the federal agencies by NEPA are "essentially procedural", the Court noted further that agency decisions may be set aside for both "substantial procedural or *substantive reasons* as mandated by statute." *Vermont Yankee, supra,* 435 U.S. at 558, 98 S.Ct. at 1219, 55 L.Ed.2d at 488 (emphasis supplied). The TVA contends that its decisions whether or not to reconstruct the Ocoee No. 2 project, or whether or not to allow recreational releases of water, are "nonjusticiable," and cites numerous cases holding that TVA's operating decisions are "matters for administrative and legislative determina-

tion which are not subject to judicial review." *See, e.g., United States ex rel TVA v. Easement & Right of Way, Logan Co., Ky.*, 375 F.2d 120 (6th Cir. 1967). These cases, however, were decided prior to the enactment of NEPA, which authorized the courts to review agency decisions in order to determine whether the agency complied with NEPA by taking a "hard look" at the environmental consequences of its actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976). A reviewing court may not substitute its judgment for that of the agency, *Strycker's Bay, supra*, but it may make a careful and searching inquiry into the facts to determine whether the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values. *Calvert Cliffs', supra; Environmental Defense Fund v. Tennessee Valley Authority*, 371 F.Supp. 1004, 1013 (E.D.Tenn.1973), *affirmed* 492 F.2d 466 (6th Cir. 1974); *Environmental Defense Fund v. Corps of Engineers*, 470 F.2d 289 (8th Cir. 1972). *See also Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

### A—Adequacy of the Environmental Impact Statement

■ The TVA asserts initially that no EIS was required in connection with its decision to reconstruct the Ocoee No. 2 project, because its proposed action is not a "major Federal action significantly affecting the quality of the human environment" within the meaning of Section 4332(2)(c). Instead, the TVA contends, the reconstruction of the dam and flume would merely return the Ocoee to the environmental conditions that had existed there for almost 70 years. An agency determination whether or not to prepare an EIS is reviewable under a "reasonableness" standard. The court is to review the administrative records as well as other evidence to determine whether the agency adequately considered the values set out in NEPA and the potential environmental effects of the project before the agency reaches its decision on whether an EIS was necessary. If the agency engaged in this analysis and reasonably concluded that no EIS was required, that decision will be upheld. *Sierra Club v. Hassell*, 15 E.R.C. 1666, 1667–68, 636 F.2d 1095 (5th Cir. 1981); *Save the Bay, Inc. v. U. S. Corps of Engineers*, 610 F.2d 322 (5th Cir. 1980). In this case, however, the TVA decided that an EIS should be prepared. There is no claim on the part of the plaintiffs that that decision was erroneous. The TVA, having already decided that the preparation of an EIS was in order, may not now avoid criticisms of that EIS by contending that no EIS was required. The Court concludes, therefore, that the TVA's contention that no EIS was required is without merit.

■ The next issue presented is whether the final EIS prepared by the TVA satisfied the requirements of Section 4332(2)(c). An EIS must discuss, in searching detail, the significant environmental impacts resulting from a proposed project. *Environmental Defense Fund v. TVA, supra*, 371 F.Supp. at 1007. The list of alternatives, and their discussion, need not be exhaustive, however, and the EIS is adequate if it adequately discusses only those alternatives that are "reasonably available." *Sierra Club v. Froehlke*, 359 F.Supp. 1289, 1344 (S.D.Tex.1973). A review of the final EIS prepared in this case discloses that it does discuss in detail a full range of construction and recreational alternatives in connection with TVA's proposed reconstruction of Ocoee No. 2. It's failure to discuss the effect of using chromated copper arsenate as a wood preservative does not make the EIS inadequate, because it appears that the environmental effect of using that chemical is insignificant. *See* Affidavit of Bruce R. Brye, Chief of TVA's Water Quality Branch (Court File # 13).

■ Although the final EIS does discuss a full range of alternatives in connection with the reconstruction of Ocoee No. 2, it does not discuss the actual combined construction and recreation alternative chosen by the TVA Board of Directors. As a consequence, the public was never given the

opportunity to discuss, evaluate or comment upon, that alternative. No public discussion was had upon the TVA's decision to require five million dollars as a separate capital investment by Congress as a prerequisite to recreational releases of water from the dam, and no public discussion was had upon the concept of requiring user fees as a means of funding those recreational releases. The failure of the EIS to discuss the plan ultimately adopted by the TVA does not, however, make the EIS inadequate. The *environmental* impact of scheduled recreational releases of water and the *environmental* impact of no releases of water was discussed in the EIS. These environmental considerations were fully presented to the agency decision makers. This is all that is required of an EIS. *Matsumoto v. Brinegar,* 568 F.2d 1289 (9th Cir. 1978). The plaintiffs' contentions that the final EIS is inadequate because it fails to discuss the need for a reconstruction of the Ocoee No. 2 *vis-a-vis* TVA's overall power generation needs or because it fails to discuss the impact of the construction as it affects elimination of whitewater recreation areas in general are without merit. Courts should be especially reluctant to review an agency's decision to treat a construction project as an independent and environmentally-separate "impact." The task of determining the interrelationships of various construction projects is one that is assigned to the special competency of the agency. This Court cannot say that the TVA's decision in this regard was "arbitrary." *See Kleppe v. Sierra Club, supra,* 427 U.S. at 413–14, 96 S.Ct. at 2731–32, 49 L.Ed.2d at 592–95.

■ The plaintiffs contend further that the final EIS is inadequate because incorrect figures were used to compute the benefit/cost ratio assigned to each proposed alternative. Principally, the plaintiffs contend that the amount used to value each recreational visit to the Ocoee ($9.00) was insufficient. The EIS notes, however, that this is the *maximum* amount established by the Water Resources Council. *See* EIS at C–17. The benefit/cost ratio calculation used by the TVA appears to have been accomplished in the manner required by the

Flood Control Act of 1936, 33 U.S.C. §§ 701a *et seq.,* and the TVA's calculations as to such matters have been held to be nonjusticiable. *See Duck River Preservation Ass'n v. Tennessee Valley Authority,* 410 F.Supp. 758, 766 (E.D.Tenn.1974), *affirmed,* 529 F.2d 524 (6th Cir. 1976). Even if the calculation were judicially reviewable, inasmuch as the figure used was the maximum allowed by the Water Resources Council, the Court cannot say that TVA's calculation was "arbitrary." Based on the foregoing discussion, the Court concludes that the final EIS prepared by the TVA adequately presented the environmental impact of the various alternatives that existed to the rehabilitation of Ocoee No. 2.

### B—*Review of TVA's Decision*

■ The Court's inquiry does not end with a determination that the final EIS prepared by the TVA was adequate. The plaintiff's challenge also the TVA's decision to rehabilitate Ocoee No. 2 without allowing for recreational releases of water absent a separate Congressional appropriation on the grounds that that decision was: (1) "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 706; and (2) because "the actual balance of costs and benefits that was struck [by the TVA] was arbitrary or clearly gave insufficient weight to environmental values." *Calvert Cliffs' Coordinating Committee, supra,* 449 F.2d at 1115. The plaintiffs thus seek a review of the TVA's decision pursuant to Section 706 of Title 5, U.S.C., which provides, in relevant part, as follows:

§ 706. *Scope of review*

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

\* \* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

\* \* \* \* \* \*

The TVA asserts that the TVA Board's decision not to accept the proposal recommended by the final EIS was based upon TVA's long-standing policy of requiring power consumers to pay only for the costs involved in producing power, but not the costs of serving recreation or other nonpower purposes. The TVA contends that the TVA Act, 16 U.S.C. §§ 831 *et seq.*, does not authorize the use of power funds for recreational purposes. Section 9a of the Act, 16 U.S.C. § 831h–1, cited by the TVA, directs the TVA, in the operation of any dam, to control or regulate the stream flow *primarily* for the purpose of flood control and navigation, and, so far as is consistent with these purposes, for the generation, transmission and marketing of electrical energy. Because there is no provision in the TVA Act for the expenditure of power funds for recreational purposes, the TVA asserts that its decision not to reduce power benefits from the Ocoee No. 2 project in order to reap recreational benefits was not "arbitrary, capricious, an abuse of discretion or contrary to law."

The plaintiffs contend, however, that NEPA authorizes the TVA to consider the environmental impact of its power generation-oriented activities and requires the TVA to incorporate environmental concerns into even its power-funded decisions. The plaintiffs rely primarily upon the District of Columbia Circuit's decision in *Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission*, 449 F.2d 1109 (D.C.Cir. 1971). In that decision, which involved a review of regulations promulgated by the Atomic Energy Commission, Judge Skelly Wright wrote:

"NEPA, first of all, makes environmental protection a part of the mandate of every federal agency and department. The Atomic Energy Commission, for example, had continually asserted, prior to NEPA, that it had no statutory authority to concern itself with the adverse environmental effects of its actions. Now, however, its hands are no longer tied. It is not only permitted, but compelled, *to take environmental values into account.* Perhaps the greatest importance of NEPA is to require the Atomic Energy Commission and *other agencies to consider* environmental issues just as they consider other matters within their mandates. This compulsion is most plainly stated in Section 102. [42 U.S.C. § 4332]

\* \* \* \* \* \*

"Senator Jackson, NEPA's principal sponsor, stated that '[n]o agency will [now] be able to maintain that it has no mandate or no requirement to consider the environmental consequences of its actions.' He characterized the requirements of Section 102 as 'action-enforcing' and stated that '[o]therwise, these lofty declarations [in Section 101] are nothing more than that.'"

449 F.2d at 1112–13. (Footnotes omitted)

The TVA contends that the proposition asserted by the plaintiffs was renounced by the Supreme Court in *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). *SCRAP* involved an action under NEPA to enjoin the enforcement of orders of the Interstate Commerce Commission allowing a 2.5 per cent surcharge on nearly all freight rates. In *Arrow Transportation Company v. Southern R. Co.*, 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963) the Supreme Court had earlier held that Congress vested *exclusive* power in the Commission to suspend rates pending its final decision on their lawfulness, and that Congress had deliberately extinguished judicial power to grant such relief. *See* 49 U.S.C. § 15(7). The District Court in *SCRAP* determined that the ICC had failed to comply with NEPA and granted an injunction suspending the surcharge until the ICC had complied. The Supreme Court reversed, holding that nothing in the statutory language or legislative history of

NEPA indicated that it was intended to repeal by implication any other statute. 412 U.S. at 693–94, 93 S.Ct. at 2418–19, 37 L.Ed.2d at 273. Rejecting *SCRAP's* reliance upon *Calvert Cliffs'* as support for the theory that NEPA was intended to restore "previously eliminated judicial power" with regard to ICC ratemaking activities, the Supreme Court stated that *Calvert Cliffs'* was not "concerned with a specific statute that restricts the power of the federal courts to grant injunctions." 412 U.S. at 696, 93 S.Ct. at 2420, 37 L.Ed.2d at 274.

The Court is of the opinion that the TVA has construed too narrowly its obligations under NEPA in the circumstances of this case. Although it is clear that, under the Supreme Court's ruling in *SCRAP*, NEPA may not be interpreted as repealing *sub silentio* a specific statutory prohibition, it is equally clear that NEPA was intended to enlarge the authority and obligations of the federal agencies to consider the impact of their actions upon the human environment. *Calvert Cliffs', supra.* Section 9a of the TVA Act (16 U.S.C. § 831h–1) does not specifically prohibit the TVA from considering environmental factors in its decisionmaking, nor does it specifically prohibit the use of injunctive relief against that agency involving matters of flood control or power generation. Instead, it merely directs that the TVA regulate stream flows *primarily*, for the purposes of navigation and flood control and, so far as may be consistent with those purposes, for the generation and sale of electric energy. NEPA's requirement that the TVA consider the environmental impact of its power decisions, and to adjust its decisions accordingly, does not undermine, or "repeal by implication," TVA's obligations under Section 9a. TVA's long-standing policy of requiring power consumers to pay only for the costs involved in producing power and not for the costs of recreation or other non-power operations is in contradiction to its obligation under NEPA to consider "environmental issues *just as [it] consider[s] other matters within [its] mandate."* *Calvert Cliffs', supra,* 449

F.2d at 1112. A policy that required the TVA to make this decision based solely upon its impact upon power production would not have permitted input with regard to environmental effects. As such it is deficient under the requirements of NEPA. Accordingly, the Court concludes that the TVA's decision was in violation of its obligations under NEPA and therefore "not in accordance with law." 5 U.S.C. § 706(2)(A)[3].

■ In reviewing the TVA's decision, however, this Court may not substitute its judgment for that of the agency. *Strycker's Bay, supra.* So long as the Agency complies with its obligation under NEPA to incorporate environmental concerns into its decisionmaking, the ultimate decision on each project belongs to the agency. The TVA will be directed, therefore, to reconsider its decision upon the reconstruction of Ocoee No. 2 in light of its obligations under NEPA.

The Court finds the contentions of the plaintiffs with regard to alleged violations of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.,* the Fish and Wildlife Coordination Act of 1958, 16 U.S.C. §§ 661 *et seq.,* and the Outdoor Recreation Act, 16 U.S.C. § 406*l* to be without merit. The defendant's motion for summary judgment will be sustained to the extent of these contentions but denied to the extent of the plaintiffs' contentions predicated upon alleged violations of NEPA, 42 U.S.C. §§ 4321 *et seq.,* and APA, 5 U.S.C. §§ 701 *et seq.*

### III—*The Appropriate Relief*

■ Having concluded that the TVA has failed to properly consider environmental factors in its decision to reconstruct Ocoee No. 2, the Court is next confronted with the designing of an appropriate interlocutory order. The plaintiffs seek a preliminary injunction directing the TVA to cease work upon the reconstruction of the project. The TVA contends, among other matters, that the plaintiffs' claim for in-

---

**3.** Because the Court has concluded that the TVA violated NEPA, the Court feels it unneces-

sary to address the plaintiffs' remaining arguments.

junctive relief is barred by the doctrine of *laches.* *Laches* is not favored as a defense to actions under NEPA. *Environmental Defense Fund v. Tennessee Valley Authority,* 468 F.2d 1164 at 1182–83 (6th Cir. 1972). This is because a delay by the plaintiffs in raising environmental issues cannot excuse the agency's responsibility to comply with the Act. *Id.* at 1183. The Court rejects therefore the defense of *laches.*

■■■ Rule 64 of the *Federal Rules of Civil Procedure* authorizes a federal court to issue a preliminary injunction to protect a plaintiff from irreparable harm and to preserve the Court's power to adjudicate a controversy before it is rendered moot by the conduct of one or more of the parties. Four primary factors are considered in determining whether such injunctive relief should issue:

> "(1) The significance of the threat of irreparable harm to the plaintiff if the injunction is not granted;
>
> "(2) The state of the balance between this harm and the injury that granting the injunction would inflict on the defendant;
>
> "(3) The possibility that plaintiff will succeed on the merits; and
>
> "(4) The public interest."

11 Wright & Miller, *Federal Practice and Procedure: Civil* § 2948.

Addressing first the balance of the harm that would be caused by the issuance of a temporary injunction restraining all further construction against the harm that would result if no such injunction were issued, the present record reflects that the reconstruction of Ocoee No. 2 is not scheduled for completion until December of 1982. In the meanwhile recreational use of the river will presumably remain fully available until that date. TVA has already paid to its contractor approximately $5.2 million and has incurred other costs of approximately $800,000. Substantial work has already been done on the project. Affidavit of Donald Ritchey, TVA Cost Engineer (Court File # 10). The plaintiffs, upon the other hand, contend that a continuation of the work on the project will cause adverse physical environmental effects, most notable of which is the occasional discharge of debris into the river.

It appears to the Court, however, that the majority of any physical effects that the project may have on the Ocoee River Gorge have already occurred. Construction access bridges, for example, have already been built, and 20,000 cubic yards of rock have already been put in place along the downstream face of the dam. Jones Affidavit (Court File # 11). The primary environmental impact that the project will have ultimately involves the availability of the streamflow for whitewater recreational uses. As noted above, the project is not scheduled for completion until December of 1982, and the permanent cessation of the streamflow is not scheduled to occur until that time. The Court concludes, therefore, that the harm that would result from the issuance of an injunction would fall more heavily upon the TVA than it would upon the plaintiffs. In addition, it would appear that the majority of any irreparable harm that might occur as a result of the project has already occurred.

Turning next to the issue of the ultimate success of the plaintiffs in obtaining a full retirement of the Ocoee No. 2 project, it should be noted that the alternative of *not* reconstructing Ocoee No. 2 and of retiring the project was rejected by the final EIS. It would appear, therefore, that when the TVA reconsiders its decision upon Ocoee No. 2 with due regard for its obligations under NEPA, it is unlikely that the TVA would adopt this alternative. The Court concludes, therefore, that the plaintiffs have little prospect of ultimately obtaining a complete cessation of work upon the project.

Turning finally to the public interest in the matters here at issue, the Court is of the opinion that the public would best be served if the plaintiffs' request for an order restraining construction were denied for a reasonable period pending reconsideration by the TVA of its power decision as it relates to Ocoee No. 2 and in light of the requirements of NEPA as interpreted in this opinion.

#### IV—Conclusions

In summary, the Court is of the opinion that the TVA, in basing its decision to reconstruct Ocoee No. 2 solely upon the project's impact upon power production, and without allowing for recreational releases of water absent separate funding, has violated the requirements of NEPA. Its decision in this regard is accordingly contrary to law. The motion to dismiss, or alternatively, for summary judgment, filed on behalf of TVA will be denied except to the extent that the plaintiffs seek relief under the Federal Water Pollution Control Act, the Fish and Wildlife Coordination Act and the Outdoor Recreation Act. The Court is of the further opinion that the plaintiffs' motion for a preliminary injunction restraining the continuation of further work upon Ocoee No. 2 would, for the present, be inappropriate and contrary to the public interest. Rather, action upon the motion will be stayed for a period of 90 days to permit the TVA Board to reconsider its Ocoee No. 2 reconstruction decision in light of the requirements of NEPA as interpreted in this opinion. TVA will within the time allotted make further response herein with regard to its action in the premises.

An order will enter in accordance with the foregoing opinion.

#### ON RENEWED MOTION FOR SUMMARY JUDGMENT

The plaintiffs in this action seek to enjoin the Tennessee Valley Authority (TVA) from the reconstruction and operation of the Ocoee No. 2 Power Generation Project. The Court has heretofore entered a Memorandum and Order staying discovery, directing reconsideration by the TVA of its reconstruction decision in light of the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C., § 4321 et seq., and further directing that the plaintiffs' motion for a preliminary injunction be stayed pending reconsideration. The TVA has now reported upon the action taken by it pursuant to the Court's instructions. The case is presently pending before the Court upon the TVA's renewed motion for summary judgment (Court File No. 39), the plaintiffs' renewed motion for a preliminary injunction, (Court File No. 43), and the plaintiffs' motion to lift the stay of discovery (Court File No. 40).

In connection with its renewed motion for summary judgment, the TVA seeks to have the Court reconsider its former Memorandum in certain respects. The Court has received briefs and oral argument upon these matters. In addition, the Tennessee Valley Public Power Association (TVPPA) an association of municipally and cooperatively owned electric power distributors, has sought and been granted permission to file an amicus curiae brief in support of the TVA motion to reconsider and the TVA renewed motion for summary judgment.

Reference is made to this Court's former opinion for a statement of the issues in this lawsuit, and for a summary of the relevant facts not in dispute, all as reflected in the record then before the Court. The record has now been supplemented to the extent of the filing of a certified copy of a resolution duly adopted by the TVA Board of Directors at its September 2, 1981, meeting, together with supporting documents. (Court File No. 37)

In response to the Court's instructions that the TVA

"... reconsider its Ocoee No. 2 construction decision in light of the requirements of NEPA, and without excluding recreational releases of water absent separate funding for such releases..."

the documents now of record reflect that the following further action has been taken by the TVA: 1) at a meeting held in Murphy, North Carolina, on July 14, 1981, the TVA Board of Directors heard extensive comment on the matters under consideration from TVA staff and numerous members of the public, including commercial recreation interests, the organizational plaintiff, private users, local interests and power consumers. Notice of the time, place and agenda of this meeting was duly announced to the public in advance.

2) Upon further notice and at meetings held in Knoxville, Tennessee, on September 2, 1981, the TVA Board of Directors received additional representations from members of the public and received the written report of its General Manager.

3) At the meeting of the TVA Board of Directors in Knoxville on September 2, 1981, the reconsideration process concluded with the adoption by the Board of a resolution that found and determined as follows: (a) the rehabilitation and operation of the Ocoee No. 2 Hydro Plant for power is cost effective and will provide a valuable source of power needed and useful on the TVA system; (b) bypassing the turbines and making periodic recreation releases on approximately 82 days during summer months would provide an opportunity for high quality private and commercial white water recreation use between the dam and the powerhouse; (c) the environmental impacts associated with such rehabilitation and recreation releases are as described in the final environmental impact statement; (d) Ocoee No. 2 Hydro Plant is a single-purpose power facility, bought and paid for by TVA ratepayers, the electrical output of which can be used to reduce operation of more costly generating sources on the TVA system with attendant substantial savings to ratepayers, but such use would be foreclosed during any periods in which recreation releases are provided; (e) a commitment to operate this single-purpose power facility for an inconsistent nonpower recreation purpose, the economic burden of which would fall on TVA power consumers, would be unwise and undesirable, and the detriment to the public from so doing would outweigh any benefit to recreation; and (f) based on the staff's recommendation, it appears that the possibilities of providing recreation releases on approximately 82 days per year under arrangements ensuring such compensation, utilizing a system of concession or license fees from commercial rafting operators and possible future State or Federal supplemental funding to fully compensate for power losses, should be explored and, if feasible, implemented.

Based upon such findings and determinations, the Board ratified and confirmed its November 8, 1979, approval of the rehabilitation of the Ocoee No. 2 power facility and directed that it be operated exclusively for power generation, absent a method for ensuring compensation for power losses associated with recreation releases. Such compensation is not to be limited to appropriations but may include any combination of concession, license or user fees, or other sources of funding. The Board directed the TVA staff to continue the reconstruction work so as to resume power operations as soon as possible. Finally, it delegated to the General Manager authority to provide for approximately 82 days of recreation releases per year upon development of appropriate compensation arrangements.

Upon this state of the record the Court is of the opinion that no genuine issue of fact exists, but that the TVA has now complied with all of the requirements of NEPA in its decision to proceed with the reconstruction of Ocoee No. 2. As concluded by the Court in its previous Memorandum, the final Environmental Impact Statement (EIS) prepared by the TVA adequately presented the environmental impact of the various alternatives that existed with regard to the proposed rehabilitation of Ocoee No. 2. However, this Court further concluded in its previous Memorandum that the TVA's former action with regard to the rehabilitation of Ocoee No. 2 was deficient under the requirements of NEPA in that it appeared to have been predicated upon an interpretation of Section 9a of the TVA Act (16 U.S.C., § 831h–1) that would exclude environmental considerations in projects funded by electric power revenues. Although the TVA has now ratified its former decision to proceed with the rehabilitation and operation of Ocoee No. 2 with provision for recreational releases of water only under arrangements that would assure full compensation for electric power losses incident to such recreational water releases, it has done so only after an evaluation of environmental factors along with other considerations within its mandate. The TVA having now included environmental considerations in its

decision making, this Court cannot say that the procedures followed or the conclusions reached by the TVA were either arbitrary, capricious or otherwise unlawful. Nor may this Court substitute its judgment for that of the TVA in reviewing its decision. See *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980).

Turning to TVA's motion to reconsider, it appears that the TVA seeks in effect to have the Court modify its former opinion so as to exempt power projects initiated by it pursuant to Section 9a of the TVA Act (16 U.S.C. § 831h–1) from the requirements of NEPA. Suffice it to say, the Court can find no basis in reason or in law for making such an exemption. The thrust of NEPA is largely procedural. As recently stated by the Supreme Court in *Weinberger v. Catholic Action of Hawaii*, —— U.S. ——, ——, 102 S.Ct. 197, 201, 70 L.Ed.2d 298, 303 (1981), the Act has two principal aims:

> "The first is to inject environmental considerations into the federal agencies decision-making process by requiring the agency to prepare an EIS. The second aim is to inform the public that the agency has considered environmental concerns in its decision-making process."

NEPA does not dictate that the TVA direct power resources or funds to non-power purposes. It does dictate that impact upon power production not be the sole basis for TVA's decisionmaking in capital projects coming within the scope of NEPA. In this regard NEPA represents less of an intrusion upon TVA's power decision-making process than the Endangered Species Act, 16 U.S.C. § 1531, as construed in *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

In light of the Court's decision herein, the plaintiffs' motions seeking a temporary injunction and requesting the Court set aside the stay of discovery herein are rendered moot. An order will enter denying the TVA's motion to reconsider, but otherwise sustaining the TVA's motion for summary judgment and dismissing this lawsuit.