UNITED STATES of America ex rel. TENNESSEE VALLEY AUTHORITY and Tennessee Valley Authority, Plaintiffs-Appellees,

v.

TENNESSEE WATER QUALITY CONTROL BOARD, et al., Defendants-Appellants.

No. 82–5288.

United States Court of Appeals, Sixth Circuit.

Argued May 16, 1983.

Decided Sept. 23, 1983.

Rehearing Denied Oct. 20, 1983.

William M. Leech, Jr., Atty. Gen. of Tennessee, Michael Pearigen (argued), Asst. Atty. Gen., Nashville, Tenn., for defendants-appellants.

Herbert S. Sanger, Jr., Gen. Counsel, James E. Fox, Assoc. Gen. Counsel (argued), Robert C. Glinski, Brent R. Marquand, Tennessee Valley Authority, Knoxville, Tenn., for plaintiffs-appellees.

Nancy B. Firestone, Appellate Section, Land & Natural Resources Div., Dept. of Justice, Washington, D.C., amicus curiae for U.S.

Before EDWARDS, Chief Judge, LIVELY, Circuit Judge, and GUY, District Judge.*

* The Honorable Ralph B. Guy, Jr., Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

LIVELY, Circuit Judge.

The question in this case is whether the Tennessee Water Quality Control Board may require the Tennessee Valley Authority (TVA) to acquire a state permit for the reconstruction and operation of a dam and flume on a navigable waterway within the State of Tennessee. The case arises under the Federal Water Pollution Control Act, as amended, commonly referred to as the Clean Water Act (the Act), 33 U.S.C. § 1251 et seq. (1976 ed. and Supp. V).

## I.

### A.

A private power company built a hydroelectric unit on the Ocoee River in Tennessee in 1913. Water was diverted to the power plant by the second in a series of three dams on the river. This dam is referred to as Ocoee No. 2. TVA acquired all three dams in 1939 and built an additional dam in 1941. Ocoee No. 2 consists of a rock-filled timber crib dam which can divert water into a wooden flume that leads to a powerhouse approximately four and one-half miles downstream. The dam does not impound water, but merely diverts it. From the time the project was put into operation until 1976 the four and one-half miles of riverbed between the dam and the powerhouse contained very little water, consisting primarily of seepage through the dam. In September 1976 TVA shut down the project in order to repair the dam and the steel support trestles of the flume. As a result of the shutdown the Ocoee has been allowed to run its natural course along the streambed and it has provided excellent rafting and canoeing. Since the stretch of the river between the dam and the power plant is adjacent to a U.S. highway the recreational area has been accessible to large numbers of visitors.[1]

### B.

TVA determined to reopen the Ocoee No. 2 project after completion of the repairs without allowing for recreational releases of water into the riverbed between the dam and powerhouse. The decision was made after Congress rejected a requested appropriation to provide for the loss of revenue from electricity sales which would result from providing for 82 days of recreational release of water annually. Suit was filed by the Ocoee River Council, a non-profit corporation chartered in part to promote recreational uses of the Ocoee River, a private individual who uses the river for recreational purposes and a commercial rafting company to enjoin further work on the project for alleged violation of a number of federal statutes. The district court found that TVA had prepared an adequate final environmental impact statement in connection with its decision to reconstruct Ocoee No. 2. *Ocoee River Council v. T.V.A.*, 540 F.Supp. 788, 795–96 (E.D.Tenn.1981). However, the court also found that the decision to proceed with the reconstruction without any provision for recreational use of the Ocoee River between the dam and the powerhouse was deficient under the National Environmental Policy Act (NEPA) and therefore "not in accordance with law." 5 U.S.C. § 706(2)(A). 540 F.Supp. at 798. Rather than granting an injunction, however, the district court stayed the action in order for TVA to reconsider its decision in light of the NEPA requirements.

After holding several public hearings TVA ratified its previous decision to rehabilitate the Ocoee No. 2 hydroelectric facility and directed that it be operated exclusively for power generation in the absence of some method for ensuring compensation for power losses associated with recreational releases. The general manager of TVA was granted authority to provide for approximately 82 days of recreational releases per year upon development of appropriate compensation arrangements, which were not limited to appropriations but could include concession, license or user fees or other sources of funding. The district court then found that TVA's decision had been

---

1. This statement of facts is derived from the district court's opinion in a related case. See

*Ocoee River Council v. T.V.A.*, 540 F.Supp. 788, 791 (E.D.Tenn.1981).

reached after evaluation of environmental factors as mandated by NEPA, along with other proper considerations, and granted TVA's motion for summary judgment, dismissing the action. *Id.* at 800–02.

### C.

The plaintiffs did not appeal the final judgment of the district court. However, the Ocoee River Council had filed a complaint with the Commissioner of the Tennessee Department of Public Health prior to entry of the final judgment by the district court. This complaint alleged that the Ocoee No. 2 project would violate the Tennessee Water Quality Control Act unless TVA obtained a water quality permit from the State for diversion of the Ocoee. The commissioner investigated the complaint and by a letter dated December 11, 1981 advised TVA that he had concluded "that TVA's proposed activity requires a State water quality permit pursuant to T.C.A. 70–330(b)" (Tennessee Code Annotated, Section 70–330(b)). One of the two items which the commissioner considered in reaching this conclusion was a written opinion of the Attorney General of Tennessee. In this opinion the Attorney General concluded that a state permit was required for Ocoee No. 2 because the United States Environmental Protection Agency (EPA) had approved Tennessee's permit system as contained in the Tennessee Water Quality Control Act of 1977. The Attorney General pointed out that the authority for states "to create, administer, and enforce state permit systems" under the national pollution discharge elimination system derived from section 402 of the Act, 33 U.S.C. § 1342.

### II.

TVA appealed the commissioner's decision to the Tennessee Water Quality Control Board and then filed a petition to remove the proceedings to the federal district court. On the same day TVA filed a declaratory judgment action in the same district court and a motion to consolidate it with the removed action. In the original district court action TVA sought a declaration that the Tennessee Water Quality Control Board and the commissioner had no authority to regulate or interfere with TVA's projected repair and operation of Ocoee No. 2, "by requiring a permit or otherwise."

The Tennessee defendants filed a motion to remand the removed case and a motion to dismiss the declaratory judgment action. In the alternative, if remand were not granted, it filed a motion to dismiss the consolidated actions or for summary judgment. The Ocoee River Council filed a motion to intervene with a motion to remand. However, the district court did not act on the motion to intervene. This court permitted the Ocoee River Council to file a brief and to participate in oral argument as amicus curiae.

The district court granted the motion to consolidate the action, but did not rule on the motion to remand the removed action. Following extensive briefing the district court granted TVA's motion for summary judgment. The district court and the parties agreed that decision of the consolidated actions depended primarily on the proper construction of Section 313 of the Act as amended, 33 U.S.C. § 1323 (1976 ed. and Supp. V), which provides in pertinent part:

**§ 1323. Federal facilities pollution control**

(a) Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, and each officer, agent, or employee thereof in the performance of his official duties, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges. The preceding sentence shall apply (A) to any requirement whether substantive or procedural

(including any record-keeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner. This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law. Nothing in this section shall be construed to prevent any department, agency, or instrumentality of the Federal Government, or any officer, agent, or employee thereof in the performance of his official duties, from removing to the appropriate Federal district court any proceeding to which the department, agency, or instrumentality or officer, agent, or employee thereof is subject pursuant to this section, and any such proceeding may be removed in accordance with section 1441 et seq. of title 28.

The district court found that section 313 waives federal sovereignty over only those activities of federal agencies resulting in the discharge or runoff of pollutants and that Ocoee No. 2 merely diverts the water from its bed for a short distance, resulting in no discharge or runoff of pollutants. In reaching its conclusion the district court pointed out that Ocoee No. 2 has been operated for many years as an integral part of a unified dam and reservoir system over which TVA has been given control by a series of congressional enactments. The court noted that Ocoee No. 2 was acquired and operated solely for the production of hydroelectric power and that Congress had refused to appropriate funds to replace lost power revenues if water releases were made for recreational purposes. The district court summarized its holding in a sentence near the end of its memorandum opinion. "The State cannot under the guise of regulation of discharge or runoff of pollutants exercise the right of control over a unified federal navigation, flood control and power operation, where federal sovereignty has been retained."

## III.

### A.

The state defendants and amicus Ocoee River Council argue that the district court misconstrued the impact of the words "discharge or runoff of pollutants" in section 313(a). They point out that section 313(a) has two subsections. Subsection (1) requires every department, agency, or instrumentality of the federal government having jurisdiction over any property or facility to comply with all regulations—federal, state, interstate and local—respecting the control and abatement of water pollution in the same manner as any nongovernmental entity. This duty is not modified, the defendants and amicus say, by a requirement that there be a discharge or runoff of pollutants. On the other hand, these parties read subsection (2) to require compliance by federal entities engaged in activities only if those activities result in the discharge or runoff of pollutants. Under this construction "resulting ... in the discharge or runoff of pollutants" is a condition requiring compliance only when applied to the second category of federal involvement—"any activity." The requirement of compliance is absolute with respect to the first category—"having jurisdiction over any property or facility."

In the alternative the defendants argue that even if the district court's construction of section 313 is correct Ocoee No. 2 is a facility "resulting" in discharge or runoff of pollutants. This argument is based on the broad definition of "pollution" found in 33 U.S.C. § 1362(19). (The term "pollution" means "the man-made or man-induced alteration of the chemical, physical, biological and radiological integrity of water"). It is clear that federal agencies are subject to the procedural as well as the substantive provisions of programs respecting the control and abatement of water pollution. Since the Tennessee permit requirement is part of its approved water quality control program, it follows that TVA must obtain a state permit before proceeding with any

project which will alter the composition of the Ocoee River waters, the defendants and Ocoee River Council argue.

### B.

TVA asserts that Congress provided for the unified development and control of the Tennessee River System by TVA and that the State of Tennessee has no authority to regulate its activities in the absence of express congressional consent thereto. TVA finds no such consent in section 313, contending that it applies only to runoff and "point source" discharge of pollutants. A dam which merely diverts the water of a river, adding no foreign substance and creating no runoff, is not subject to any state requirement, according to TVA. It relies on various definitions contained in section 502 of the Act, 33 U.S.C. § 1362:

(6) The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

\* \* \* \* \* \*

(12) The term "discharge of a pollutant" and the term "discharge of pollutants" each means (A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft.

\* \* \* \* \* \*

(14) The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be dis-

charged. This term does not include return flows from irrigated agriculture.

\* \* \* \* \* \*

(16) The term "discharge" when used without qualification includes a discharge of a pollutant, and a discharge of pollutants.

TVA relies in particular on the use of the word "addition" in both subsections of 33 U.S.C. § 1362(12), *supra,* and asserts there is no claim that the diversion at Ocoee No. 2 adds any pollutants to the river.

■ The state defendants also argue that a 1977 amendment to section 313 made it clear that a broad waiver of sovereign immunity was intended by Congress. TVA maintains that the 1977 amendment did not change the extent to which section 313 waived immunity from state or local control; it merely made it clear that where federal agencies are subject to state or local regulation they must comply with state or local procedural as well as substantive requirements. The qualifying phrase, "resulting, or which may result, in the discharge or runoff of pollutants" appeared in the 1972 version and was unchanged by the 1977 amendment to section 313. We agree with TVA's interpretation of the 1977 amendment. This amendment was designed to make it clear that federal agencies are subject to procedural as well as substantive provisions of state water quality control laws. It was adopted, at least in part, in response to *EPA v. California ex rel. State Water Resources Control Board,* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976), in which the Supreme Court held that federal facilities were required to comply with state substantive requirements only. See S.Rep. No. 95–370, p. 67, *reprinted in* [1977] U.S.Code Cong. & Adm.News 4392.

### C.

EPA was permitted to file a brief and to participate in oral argument. Its position is that the district court erred in concluding that section 313 is not applicable to federal dam operators. It argues, in agreement with the defendants and the Ocoee River

Council, that "discharge or runoff of pollutants" in section 313 modifies "activities" only and that federal property and facilities are subject to state regulation without regard to whether they "result" in discharge or runoff of pollutants. However, EPA contends, the Tennessee authorities erred in treating Ocoee No. 2 as a "point source" which required a discharge permit for its continued operation. Instead the State should have treated the project as a "nonpoint source" of pollution. It relies on a definition in 33 U.S.C. § 1314(f)(2)(F) of nonpoint sources of pollution as pollution resulting from—

> (F) changes in the movement, flow, or circulation of any navigable waters or ground waters, including changes caused by the construction of dams, levees, channels, causeways, or flow diversion facilities.

EPA argues that the State must deal with nonpoint sources of pollution under section 208 of the Act, 33 U.S.C. § 1288, a comprehensive statutory scheme for identifying areas having substantial water quality control problems and providing for federally funded areawide waste treatment management by the states. EPA agrees with TVA that section 313 does not give the Tennessee Water Quality Control Board authority to utterly frustrate the agency's congressionally mandated hydroelectric operations by altering the use of Ocoee No. 2 to assure an adequate flow of water for recreational rafting below the dam. EPA states in its brief, "The State's authority under Section 313 is limited to establishing reasonable water pollution controls that are not inconsistent with the purposes for which Ocoee Dam No. 2 was purchased."

### IV.

#### A.

■ This case must be decided on the basis of the Clean Water Act in its entirety, not merely on a construction of section 313. The clear purpose of that section is to make federal agencies subject to applicable state and local requirements, procedural as well as substantive, respecting the control and abatement of water pollution. However, the authority of the states over navigable waters is limited by other provisions of the Act.

One of the primary objectives of the Act, as stated in section 101, 33 U.S.C. § 1251(a)(1), is to achieve a national goal "that the discharge of pollutants into the navigable waters be eliminated by 1985." The Act seeks to achieve this particular objective by creating a national pollutant discharge elimination system (NPDES) based on the issuance of permits for the discharge of pollutants. Under section 402(a)(2) of the Act, 33 U.S.C. § 1342(a)(2), the Administrator of EPA is required to prescribe the conditions of such permits and to assure compliance with those conditions and other requirements of the Act. Section 402(b), 33 U.S.C. § 1342(b), permits a state to administer its own permit program for discharges into navigable waters within its jurisdiction upon approval of the program by EPA. Here Tennessee relied specifically on its permit program approved by EPA pursuant to § 402 as the basis of its attempt to regulate the diversion of water at Ocoee No. 2.

EPA has consistently taken the position that the section 402 permit system does not apply to dams because they are "nonpoint sources" of pollution, rather than dischargers of pollutants. In *National Wildlife Federation v. Gorsuch*, 693 F.2d 156 (D.C. Cir.1982), an environmental group sought a declaration that the Administrator of EPA had a nondiscretionary duty to require dam operators to apply for pollutant discharge permits under section 402(a) of the Act. The plaintiff argued that any adverse change in the quality of reservoir water from its natural state involves a "pollutant," and release of such water through a dam into the downstream river is an "addition of a pollutant" from a point source. EPA contended that for addition of a pollutant to occur within the definition in section 502(12) the point source must introduce the pollutant into the water. Although alterations in the properties of the water are "pollution" under the broader definition

contained in section 502(19) ("the man-made or man-induced alteration of the chemical, physical, biological and radiological integrity of the water"), all alterations do not fit the narrower definition of "pollutants" contained in section 502(6) ("dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal and agricultural waste discharged into water"). Since the section 402 permit system applies only to the discharge of pollutants EPA argued that it was not directed by the Act to require dam operators to obtain permits.

The court in *National Wildlife Federation* concluded that EPA's construction of the Act is entitled to considerable deference. Its treatment of dams as nonpoint sources of pollution was found to represent a considered decision which was reasonable when the purposes and objects of the Act are considered. The court agreed with EPA that Congress had treated "pollutants" and "pollution" differently and that section 402 is concerned with the addition of pollutants, not with water pollution generally. It quoted with approval from *Missouri ex. rel. Ashcroft v. Department of the Army*, 672 F.2d 1297, 1304 (8th Cir.1982), a case relied on by the district court in the present case:

> "[T]he discharge of a pollutant requires an 'addition' of a pollutant from a 'point source' and neither term applie[s] to soil erosion or the oxygen content of water."

693 F.2d at 175. The court in *National Wildlife Federation* pointed out that Congress viewed the NPDES program as the most effective weapon against pollution, yet limited its application to situations involving the addition of pollutants from point sources. Water pollution arising from nonpoint sources is to be dealt with differently, specifically through the device of area-wide waste treatment management by the states. Similar conclusions were reached in *South Carolina Wildlife Federation v. Alexander*, No. 76–2167–2 (D.S.C. April 26, 1982) (unreported decision).

## B.

The present case is unusual. The defendants and Ocoee River Council are not concerned with the operation of the power plant or the condition of the water returned to the river after it has been used for the production of electricity. Their only claim is that the comparatively small quantity of water which seeps through the dam is "polluted" by changes in its physical and chemical properties occurring while it flows through the four and one-half miles of riverbed between the dam and the power plant. There is no claim that any pollutants as defined in the Act are added to the river water by the diversion into or through the flume.

The "pollution" which the Commissioner of the Tennessee Department of Health identified is not subject to control or abatement by use of the discharge permit system. The right of the State to require discharge permits is derived solely from section 402. EPA has consistently treated dams as nonpoint sources of pollution which are not subject to the discharge permit requirements of section 402. We agree with the District of Columbia Circuit that this interpretation of the Act by the agency charged with its administration and enforcement is entitled to deference. Since EPA does not require discharge permits from dam operators under section 402(a), the states may not do so under section 402(b). Accordingly, we affirm the judgment of the district court in its holding that Tennessee could not require TVA to obtain a permit for the reconstruction and operation of Ocoee No. 2.

■ Our decision does not mean that we adopt the construction of section 313 urged upon us by TVA and followed by the Eighth Circuit which held that a federal agency is subject to state water quality control laws only if it is causing a discharge or runoff of pollutant. See *Missouri ex rel. Ashcroft v. Department of the Army, supra*, 672 F.2d at 1304. We merely hold that a state may not subject a federal agency to the requirements of its discharge permit

program when the pollution complained of does not result from the discharge of pollutants from a point source. A dam, as a nonpoint source, may be subject to some state or local regulation as part of a section 208 areawide waste treatment management program. We do not undertake to determine the limits of such authority in this case since the state sought only to require a permit under authority derived from section 402.

### C.

 The defendants and amici curiae have argued that, regardless of our decision in the declaratory judgment action, we should remand the removed proceedings to the Tennessee Water Quality Control Board to complete its administrative consideration of the complaint which precipitated this litigation. They argue that removal under 28 U.S.C. § 1441 applies only to state court actions, not to administrative proceedings. There is support in case law for this argument as well as for the contrary argument that state administrative proceedings are subject to removal. Compare *County of Nassau v. Cost of Living Council,* 499 F.2d 1340 (Em.App.1974), and *California Packing Corp. v. I.L.W.U. Local 142,* 253 F.Supp. 597 (D.Hawaii 1966), with *Volkswagen de Puerto Rico, Inc. v. Puerto Rico Labor Relations Board,* 454 F.2d 38 (1st Cir.1972); *Floeter v. C.W. Transport, Inc.,* 597 F.2d 1100 (7th Cir.1979) (per curiam), and *United States v. Pennsylvania Environmental Hearing Board,* 377 F.Supp. 545 (M.D.Pa.1974).

We do not consider it necessary to decide whether administrative proceedings are removable generally. Section 313 expressly preserves to federal agencies the right to remove to an appropriate district court "any proceeding" to which it is subject thereunder. Since the Tennessee Water Quality Control Board was relying on section 313 in seeking to require TVA to obtain a permit we believe its proceedings were removable for the purpose of determining the federal question of the extent to which Congress had waived sovereignty. Even if the proceedings were improperly

removed, however, a remand would be pointless in view of our decision in the declaratory judgment action.

The judgment of the district court is affirmed. No costs are allowed. Each party will pay its own costs on appeal.