Sincerly,
Robert E. Cotner
93780, Box 220
Stringtown, Okla.
74569

APR ?? 1983
ATTORNEY GENERAL

Frank J. KELLEY, Attorney General of Michigan for and on Behalf of the PEOPLE OF the STATE OF MICHIGAN and the Natural Resources Commission, Plaintiffs,

v.

The UNITED STATES of America; United States Department of Transportation; the Honorable Elizabeth Dole, Secretary of the Department of Transportation; the United States Coast Guard; and Admiral James Gracey, Commandant of the Coast Guard, Defendants.

No. G83–630.

United States District Court,
W.D. Michigan, S.D.

Sept. 20, 1985.

Frank J. Kelley, Atty. Gen. of Michigan by Stephen F. Schuesler, Asst. Atty. Gen., Environmental Protection Div., Lansing, Mich., for plaintiffs.

John A. Smietanka, U.S. Atty., Grand Rapids, Mich., and Dean K. Dunsmore, U.S. Dept. of Justice, Land & Natural Resources Div., Environmental Defense Section, Washington, D.C., for defendants.

## OPINION

ENSLEN, District Judge.

This case is currently before the Court on Defendants' two pending dispositive motions. On July 13, 1984, Defendants filed a motion to dismiss Plaintiffs' complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (FRCP) or in the alternative for summary judgment pursuant to FRCP 56(b). In this motion, Defendants contend that Plaintiffs' claim under the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (Clean Water Act or CWA), fails to state a claim upon which relief can be granted. Defendants also argue that Plaintiffs' state law claims under Michigan's Water Resources Commission Act, M.C.L.A. § 323.1 *et seq.* (WRCA), and Thomas J. Anderson, Gordon Rockwell Environmental Protection Act, M.C.L.A. § 691.1201 *et seq.* (MEPA), are both barred by sovereign immunity. Defendants' second dispositive motion was filed on June 14, 1985, and requests a grant of partial summary judgment dismissing all claims for damages or costs incurred by East Bay Township and by residents, homeowners and businesses in the Avenue E area. Defendants argue that the instant Plaintiffs, the State Attorney General and the Natural Resources Commission, do not as a matter of law have standing as *parens patriae* to represent these narrow, private interests in a suit against the federal government. These two motions will be discussed separately.

At this point, some brief background is in order. Plaintiffs' original complaint contained only three counts, the federal claim under the Clean Water Act and the two state claims. Plaintiffs requested injunctive relief and an award of damages to the state on behalf of the state itself, East Bay Township and certain residents thereof. However, shortly after Defendants filed their initial motion to dismiss, Plaintiffs amended their complaint to include a fourth count claiming the same relief under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* (CERCLA). Defendants have not contested the ability of Plaintiffs to maintain their CERCLA action, except as to the narrow *parens patriae* damages issue. Therefore, even if both of Defendants' motions are granted in full, Plaintiffs' CERCLA claim would remain for resolution.

I

A. Plaintiffs Claims Under the Clean Water Act

■ In a nutshell, this case involves allegations that certain toxic chemicals were released into the ground at the United States Coast Guard Air Station in Traverse City, Michigan, by Coast Guard personnel.

Plaintiffs further allege that these chemicals contaminated the groundwater underlying the Air Station and that the plume of contamination is migrating downgradient in a north-easterly direction through East Bay Township and eventually discharging into the East Arm of Grand Traverse Bay. It is undisputed that the Coast Guard neither applied for nor received a permit from either the federal government or the state for this discharge.

Plaintiffs bring this "citizen suit" pursuant to section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), which provides in pertinent part that:

> Except as provided in subsection (b) of this section [precluding suit except after proper notice], any citizen may commence a civil action on his own behalf—
>
> > (1) Against any person (including (i) the United States and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter....

Section 301(a) of the CWA, 33 U.S.C. § 1311(a), provides that "[e]xcept as in compliance with this section and [certain other sections of the Act], the discharge of any pollutant by any person shall be unlawful." The term "discharge of a pollutant" is defined in section 502(12), 33 U.S.C. § 1362(12), as "any addition of any pollutant to navigable waters from any point source...." For the purposes of the CWA, the term "navigable waters" has been defined very broadly to mean simply "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). Some courts have interpreted "navigable waters" as broadly as possible under Congress' commerce power, *United States v. Byrd*, 609 F.2d 1204 (7th Cir.1979); *Leslie Salt Co. v. Froehlke*, 578 F.2d 742 (9th Cir.1978), even so far as to exclude from consideration any concept of navigability, in law or in fact, *United States v. GAF Corp.*, 389 F.Supp. 1379 (S.D.Tex.1975).

Defendants argue that while the term "navigable waters" is construed broadly, Congress did not intend to include groundwater within its definition. Indeed, Defendants maintain that the regulatory and enforcement aspects of the Clean Water Act were not designed to control the discharge of pollutants into the soil and groundwater. Certainly Congress realized the importance of the groundwater pollution issue. It specifically directed the Administrator of the Environmental Protection Agency (EPA) to cooperate with the states in establishing a national groundwater surveillance system. CWA section 104(a)(5), 33 U.S.C. § 1254(a)(5). It conditioned future grants to any state on the establishment of groundwater quality monitoring procedures. CWA section 106(e)(1), 33 U.S.C. § 1256(e)(1). It also directed the EPA to develop and periodically publish the latest scientific criteria for groundwater quality, the effect of its contamination, and information regarding its cleanup. CWA section 304(a)(1), (2), 33 U.S.C. § 1314(a)(1), (2). However, Defendants argue that the fact that Congress did not expressly include the term "groundwaters" in most of the regulatory provisions of Title III of the CWA, including section 301(a), indicates a clear intent to leave the regulation of groundwater pollution to the states.

This argument is substantially supported by the legislative history of the 1972 amendments. The Senate Committee on Public Works reported:

> Several bills pending before the Committee provided authority to establish Federally approved standards for groundwaters which permeate rock, soil, and other subsurface formations. Because the jurisdiction regarding groundwaters is so complex and varied from State to State, the Committee did not adopt this recommendation.
>
> The Committee recognizes the essential link between ground and surface waters and the artificial nature of any distinction. Thus, the Committee bill requires in section 402 that each State include in its program for approval under section 402 affirmative controls over the

injunction or placement in wells of any pollutants that may effect groundwater. S.Rep. No. 414, 92d Congress, 1st Sess. 73, *reprinted in* 1972 U.S.Code Cong. & Ad. News 3668, 3739. In response to the Senate's rejection of federal regulatory jurisdiction over groundwater, Representative Aspin introduced an amendment into the House to expressly bring groundwater within the regulatory scope of the Act. *See* 118 Cong.Rec. 10666 (1972) (remarks of Rep. Aspin). After a spirited debate, the Aspin amendment was defeated by a vote of 86–34. *Id.* at 10669.

This same legislative history was more thoroughly analyzed in *Exxon Corp. v. Train,* 554 F.2d 1310 (5th Cir.1977). That court characterized the Senate Report quoted above as "evinc[ing] a clear intent to leave the establishment of standards and controls for groundwater pollution to the states." *Id.* at 1325. Likewise, it concluded that the "House bill, like the Senate bill, did not authorize federal control over any phase of groundwater pollution." *Id.* at 1326.

Plaintiffs seek to distinguish the facts of the principal case from those found in *Exxon.* The instant complaint alleges that the pollutants released into the ground at the Air Station not only contaminated the groundwater, but are naturally discharging into the Grand Traverse Bay—an undisputed navigable body of water. Complaint ¶ s 34, 43 & 47. By comparison, the *Exxon* case dealt with disposal of pollutants into deep wells. The *Exxon* court prefaced its entire discussion with the recognition of the distinction:

> Throughout this opinion, we will use certain terms interchangeably that are not, strictly speaking, equivalent. The main example is our equation of "disposal into deep wells" with "disposal into groundwaters".... We make this equation because neither party before us argues that the disposal into wells at issue here ... is disposal into anything other than groundwaters. *Specifically, EPA has not argued that the wastes disposed of into wells here do, or might, "mi-*

*grate" from groundwaters back into surface waters that concededly are within its regulatory jurisdiction.... We mean to express no opinion on what the result would be if that were the state of facts.*

*Exxon,* 554 F.2d at 1312 n. 1 (emphasis added).

Plaintiffs also rely on an unpublished opinion from the Eastern District of Michigan in a case similar to the case at bar. *Kelley v. United States,* No. 79–10199 (E.D.Mich. Oct. 28, 1980). In that opinion, the court ruled that the State Attorney General could maintain an action against the United States under section 505 of the Clean Water Act for an alleged discharge of toxic chemicals into the groundwaters from sites at the Wurtsmith Air Force Base in Alpena, Michigan, where plaintiff claimed the discharge was ultimately affecting surface waters. The court's analysis on this point was brief:

> Defendants cite the case of *Exxon Corp v Train,* 554 F2d 1310 (CA 5, 1977) as their primary authority for the argument that groundwater pollution was not intended to be regulated under the Federal Water Pollution Control Act, supra. *Plaintiff, however, quite correctly points out that the Court of Appeals for the Fifth Circuit concedes that wastes which migrate from groundwaters back into surface waters are within the EPA's regulatory jurisdiction. Exxon Corp v Train,* 554 F2d 1310, 1312 Fn 1 (CA 5, 1977). This Court believes that the type of pollution of navigable waters which plaintiff complains of in the instant case is encompassed by the Federal Water Pollution Control Act, supra notwithstanding defendants' arguments to the contrary.

*Kelley v. United States,* No. 79–10199, slip op. at 2–3 (E.D.Mich. Oct. 28, 1980) (emphasis added).

I think that the court and the State Attorney General have both misinterpreted footnote one of *Exxon.* The Fifth Circuit did not concede that discharges into the soil will be subject to the regulatory provisions

of CWA if the groundwater contaminated thereby eventually migrates into navigable waters. On the contrary, it specifically "express[ed] no opinion on what the result would be [under the CWA] if that were the state of facts." *Exxon*, 554 F.2d at 1312 n. 1. Moreover, the remainder of the *Exxon* opinion and the unmistakably clear legislative history both demonstrate that Congress did not intend the Clean Water Act to extend federal regulatory and enforcement authority over groundwater contamination. Rather, such authority was to be left to the states. Therefore, Count I of Plaintiffs' complaint is dismissed.

**B. Plaintiffs' State Law Claims**

 Section 313(a) of the CWA, 33 U.S.C. § 1323(a), was amended in 1977 to waive the federal government's sovereign immunity from all state water pollution laws and processes. This section now provides in pertinent part that:

> Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, and each officer, agent, or employee thereof in the performance of his official duties, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner. This subsection shall apply not-

withstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law.

With regard to the amendment of section 313(a), the Senate Environment and Public Works Committee reported that: "[t]he act has been amended to indicate unequivocably that *all Federal facilities and activities are subject to all of the provisions of State and local pollution laws.*" S.Rep. No. 95–370, 95th Cong., 1st Sess. 67, *reprinted in* 1977 U.S.Code Cong. & Ad. News 4326, 4392 (emphasis added).

The immediate issue is whether section 313(a) operates as a waiver of federal sovereign immunity with respect to Plaintiffs' state law claims under the WRCA and the MEPA. Consent to suit must be clearly expressed, and sovereign immunity will not be impliedly waived. *Block v. North Dakota ex rel. Board of University and School Lands*, 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983). When given, such waiver must be strictly construed. *United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969).

The federal Defendants contend that the scope of section 313(a)'s waiver extends only to violations of state substantive and procedural "requirements." Defendants further argue that the Michigan statutory provisions involved here, sections 6(a), (c) of the WRCA, and sections 2(1), 4(1) of the MEPA, do not constitute such requirements. Therefore, Defendants conclude, the federal government has not consented to be sued under these provisions.

It is noteworthy that section 313(a) of the CWA closely parallels the federal sovereign immunity waiver provisions of section 118(a) of the Air Pollution Prevention and Control Act (Clean Air Act or CAA), 42 U.S.C. § 7418(a), and section 6001 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6961. *See Department of Environmental Regulation v. Silvex Corp.*, 606 F.Supp. 159, 161–62 & n. 3 (M.D.Fla.1985). In 1976, the United States Supreme Court held that the "requirements" language of the waiver provisions

of section 313(a) of the Clean Water Act and section 118(a) of the Clean Air Act referred only to objective state standards of control. *EPA v. California ex rel. State Water Resources Control Board,* 426 U.S. 200, 215, 96 S.Ct. 2022, 2029, 48 L.Ed.2d 578 (1976) (legislative history of CWA section 313 suggests "requirements" language refers only to substantive "effluent limitations and standards and schedules of compliance"); *Hancock v. Train,* 426 U.S. 167, 187–89, 96 S.Ct. 2006, 2016–17, 48 L.Ed.2d 555 (1976) (legislative history of CAA section 118 suggests "requirements" language refers only to emissions standards and compliance schedules). Furthermore, because of the narrow construction given to congressional waivers of federal sovereign immunity, similar "requirements" language has generally been held to mean "relatively precise standards capable of uniform application." *Romero-Barcelo v. Brown,* 643 F.2d 835, 855 (1st Cir. 1981), *rev'd on other grounds, sub nom. Weinberger v. Romero-Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (interpreting section 12 of the Noise Control Act, 42 U.S.C. § 4911). *See also Department of Environmental Regulation v. Silvex Corp.,* 606 F.Supp. at 163–64 (interpreting section 6001 of the RCRA). Lastly, the Sixth Circuit has held that the 1977 amendment to section 313 of the Clean Water Act "did not change the extent to which section 313 waived immunity from state or local control; it merely made it clear that where federal agencies are subject to state or local regulation, they must comply with state or local procedural as well as substantive requirements." *United States ex rel. TVA v. Tennessee Water Quality Control Board,* 717 F.2d 992 (6th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1909, 80 L.Ed.2d 458 (1984).

I now turn to the Michigan statutes under which Plaintiffs bring their claim. Section 6(a) of the WRCA, M.C.L.A. § 323.6(a), makes it unlawful to "discharge into the waters of the state any substance which is or may become injurious to the public health, safety or welfare...." Section 6(c), MCLA 323.6(c), provides that a viola-

tion of section 6(a) constitutes "prima facie evidence of the existence of a public nuisance." Similarly, sections 2(1) and 4(1) of MEPA, M.C.L.A. § 691.1202(1), .1204(1), provide that the State Attorney General and others may maintain actions for equitable and declaratory relief "for the protection of the air, water and other natural resources and the public trust therein from pollution, impairment or destruction."

I find that neither of these state statutes provide objective, quantifiable standards subject to uniform application. For that reason, neither constitute "requirements" for the purposes of section 313 of the Clean Water Act. Since the federal government has not consented to be sued under these statutes, Counts II and III of Plaintiffs' complaint must also be dismissed. Therefore, all that remains of Plaintiffs' complaint is the CERCLA claim in Count IV.

## II

■ Defendants' motion for partial summary judgment seeks an order dismissing all claims presented for costs or other damages incurred by East Bay Township and by residents, homeowners and businesses in the Avenue E area. Plaintiffs in this action, the Michigan Attorney General and the State Natural Resources Commission, purport to represent these individuals and entities as *parens patriae.* The law on this point is clear:

The state does not have standing as parens patriae against the Federal Government. *Massachusetts v. Mellon,* 262 U.S. 447 [43 S.Ct. 597, 67 L.Ed. 1078] (1923) ("while the state, under some circumstances, may sue in that capacity for protection of its citizens (*Missouri v. Illinois,* 180 U.S. 208, 241 [21 S.Ct. 331, 343, 45 L.Ed. 497]), it is no part of its duty or power to enforce their rights in respect of their relations with the Federal Government. In that field it is the United States, and not the State, which represents them as parens patriae.")

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 610 n. 16, 102 S.Ct.

3260, 3270 n. 16, 73 L.Ed.2d 995 (1982). *See also South Carolina v. Katzenbach,* 383 U.S. 301, 324, 86 S.Ct. 803, 816, 15 L.Ed.2d 769 (1966).

Plaintiffs allege that this case falls within an exception to the *Massachusetts v. Mellon* rule allowing states to maintain *parens patriae* suits against the federal government to prevent a violation of federal laws by federal agencies. *See Washington Utilities and Transportation Commission v. FCC,* 513 F.2d 1142 (9th Cir.), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975); *Louisiana v. Lee,* 596 F.Supp. 645 (E.D.La.1984), *vacated,* 758 F.2d 1081 (5th Cir.1985); *Holden v. Heckler,* 584 F.Supp. 463 (N.D.Ohio 1984); *Abrams v. Heckler,* 582 F.Supp. 1155 (S.D. N.Y.1984); *City of New York v. Heckler,* 578 F.Supp. 1109 (S.D.N.Y.), *aff'd,* 742 F.2d 729 (2nd Cir.1984); *Alabama v. TVA,* 467 F.Supp. 791 (N.D.Ala.1979), *rev'd on other grounds* 636 F.2d 1061 (5th Cir.), *cert. denied,* 454 U.S. 837, 102 S.Ct. 142, 70 L.Ed.2d 118 (1981). However, in each of these cases, the state was seeking to enforce the affirmative obligations of a federal regulatory statute. CERCLA, by comparison, is a remedial statute. Thus, the exception is inapplicable.

Plaintiffs alternatively maintain that since the state has a "quasi-sovereign interest" in its groundwater, it can maintain its *parens patriae* action. The Supreme Court has characterized quasi-sovereign interests as "inter alia, a state's interest in the health and well-being—both physical and economic—of its residents *in general.*" *Alfred L. Snapp & Son,* 458 U.S. at 607, 102 S.Ct. at 3268 (emphasis added). Such a general interest must be distinguished from "the interests of particular private parties." *Id.* Under this analysis, the state may of course proceed on behalf of the people of the State of Michigan and recover its response costs, etc.; but it may not represent the individual interests of private parties such as East Bay Township, its residents and businesses and recover response costs incurred solely by them. Accordingly, Defendants' motion for partial summary judgment is granted.

Nevertheless, in the interests of fairness and pursuant to FRCP 19(a), East Bay Township and the affected homeowners and businesses in the Avenue E area may, at their discretion, join this action as individual Plaintiffs by filing a motion to that effect with the Court no later than November 1, 1985. This joinder of Plaintiffs should cause no substantial prejudice to Defendants because Defendants have had notice of their claims since this case was filed in 1983.

An appropriate judgment order will be entered forthwith.