**STATE OF COLORADO, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF THE ARMY, Defendant.**

**Civ. A. No. 86–C–2524.**

United States District Court,
D. Colorado.

Feb. 24, 1989.

Michael R. Hope, Deputy Atty. Gen., CERCLA Litigation Section, Denver, Colo., for plaintiff.

Michael Norton, U.S. Atty., Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

CARRIGAN, District Judge.

Plaintiff, State of Colorado, commenced this action against the defendant, United States Department of the Army ("the Army") in the District Court for the City and County of Denver, Colorado, seeking an injunction to halt alleged present and future violations of certain Colorado statutes and regulations concerning hazardous waste management and control. The Army removed the case to this court.

The area giving rise to the lawsuit is known as "Basin F." It is a hazardous waste disposal pond situated within the Rocky Mountain Arsenal ("the Arsenal"). The arsenal is a federally controlled site occupying about 27 square miles near Commerce City, a suburban area northeast of Denver, Colorado. The Arsenal was constructed in 1942 to manufacture and assemble chemical warfare agents, chemical products and incendiary munitions. It also has been used for detoxification and disposal of these toxic materials. Portions of the Arsenal have been leased to private operators, including Shell Oil Company ("Shell") for the manufacture of pesticides and herbicides. The United States owns and the Army operates the Arsenal. (Shell is a defendant in a companion CERCLA case, No. 83-C-2379. These two cases have been consolidated with a third, 83-C-2386.)

The Army constructed Basin F in 1956 to store and dispose of contaminated liquid wastes generated by the Army's and Shell's chemical manufacturing and processing activities. Basin F began receiving contaminated liquid wastes in October 1956.

As originally filed in the state court, the instant action concerns solely Basin F. The State's complaint asserted numerous claims against the Army based on Colorado's Ground Water Monitoring Regulations [Colorado Hazardous Waste Regulations, 6 CCR 1007-3, ("Interim Status Standards for Owners and Operators of Hazardous Waste Treatment, Storage and Disposal Facilities, 6 CCR 1007-3, Part 265, Subpart F), issued pursuant to the Colorado Hazardous Waste Management Act ("the CHWMA"), Title 25-15, part 3, C.R.S. (1982)]. These claims include: (1) failure

to provide and monitor complying upgradient monitoring wells, in violation of § 265.91(a)(1) (First Claim); (2) failure to submit a specific ground water monitoring program, in violation of § 265.93(d)(2) (Second Claim); (3) failure to determine impact of Basin F on ground water quality, in violation of 6 CCR 1007–3, § 265.93(d)(2) (Third Claim); and (4) failure adequately to monitor and report ground water quality assessment, in violation of §§ 265.93(d)(5) and (7). The Army subsequently removed the action to this court.

On January 14, 1987, the Army filed a motion to dismiss or, in the alternative, for summary judgment or partial summary judgment, regarding the claims set forth in the plaintiff's complaint. The issues raised in the motion were fully briefed by the parties.

On December 4, 1987, the plaintiff filed its First Amended Complaint setting forth new claims and allegations. The First Amended Complaint alleges that in June, 1983, the Army submitted to the United States Environmental Protection Agency ("E.P.A.") a plan to close Basin F. It further alleges that, subsequent to E.P.A.'s authorization to the State of Colorado to operate the State's hazardous waste management program, the Colorado Department of Health ("CDH") issued a final plan to close Basin F, pursuant to State Closure Regulations (6 CCR 1007–3, Part 265, Subpart G). The Basin F Closure Plan ("the Plan") became effective October 2, 1986, as a final order of the CDH. Defendant did not appeal, or otherwise seek review of the Plan. Pursuant to the Plan's terms, it is alleged, the Army was required to complete certain remedial steps effecting Basin F's closure by October 2, 1987.

In the First Amended Complaint, the plaintiff asserts claims against the Army for: (1) failure to close Basin F in compliance with the Basin F Closure Plan (First Claim); (2) failure to comply with Colorado's Ground Water Monitoring Regulations, a claim with three subclaims, and essentially a reassertion of three of the claims set forth in the plaintiff's initial complaint (Second Claim); and (3) failure to

pay annual operating and waste volume fees, in violation of §§ 100.31(a) and (b) of State Fee Regulations, 6 CCR 1007–3, Part 100.

Plaintiff asserts that the Attorney General of the State of Colorado has standing and authority to prosecute this suit, pursuant to Executive Order No. D0012–86, issued February 4, 1986, under C.R.S. § 24–31–101(1)(a) (1982). The State Attorney General filed this action at the request of the CDH pursuant to C.R.S. §§ 24–4–106(3) and 25–15–308(2) (1982) seeking to halt present violations and prevent future violations of the CHWMA, as well as the Colorado Hazardous Waste Regulations, and to enforce the final order issued by CDH to close "Basin F." Plaintiff further asserts that this action is properly filed against the Army as defendant because Congress has waived sovereign immunity as to civil actions against federal entities to enforce state requirements regarding hazardous waste management and disposal. For this proposition the State cites § 6001 of the Solid Waste Disposal Act, as amended by the Resource Conservation Act of 1976 ("RCRA") [42 U.S.C. §§ 6901–6987], 42 U.S.C. § 6961.

The Army has moved to dismiss the plaintiff's First Amended Complaint, asserting that the United States has not waived its sovereign immunity as to these claims under RCRA § 6001, [42 U.S.C. § 6961]. Defendant Army's argument in part emphasizes that I presently have pending before me two actions directed at cleanup of the Arsenal as a whole. As stated above, these consolidated cases are *State of Colorado v. United States*, Civil Action No. 83–2386, and *United States v. Shell Oil Company*, Civil Action No. 83–C–2379. Both cases were filed under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.* CERCLA was amended by the 1986 Superfund Amendments and Reauthorization Act ("SARA"), Pub.L. 99–499, 100 Stat. 1615.

█ Defendant Army does not dispute that RCRA § 6001 [42 U.S.C. § 6961], read in conjunction with RCRA § 7002 [42 U.S.

C. § 6972], contains a waiver of federal sovereign immunity. Rather, the Army asserts that sovereign immunity is not waived under those sections when there is an ongoing CERCLA cleanup action at the site that addresses hazardous waste requirements that are the same in substance as those sought to be enforced by the state under RCRA. In essence, the Army argues that CERCLA's enforcement and response provisions pre-empt and preclude a state RCRA enforcement action with respect to the cleanup of hazardous wastes at the Arsenal.

Plaintiff State has responded by opposing the motion. Initially, I deny as moot the Army's first dispositive motion addressing the State's complaint, except for that portion of the defendant's argument that is reasserted in its second motion to dismiss.

At a hearing on the plaintiff's motion for injunctive relief, I briefly heard oral argument on the defendant's dismissal motion. More recently, the State has reasserted its position by moving for partial summary judgment, and the Army has filed an opposition memorandum to that motion. In addition, the parties have filed supplemental briefs at the court's request addressing whether the State is precluded from pursuing this action because the Army has commenced interim cleanup measures at Basin F; whether and to what extent the State will have a role in the Arsenal clean up if the instant action is dismissed; and whether the State is proceeding under RCRA § 7002, [42 U.S.C. § 6972] in this case. The parties also have filed briefs on whether the State's action is barred by the Supremacy Clause.

The issues thus have been fully briefed and orally presented by the parties. The matter is ripe for decision.

It is fundamental that the United States cannot be sued without its consent, and this immunity protects federal agencies such as the Army. In the absence of an express statutory waiver of immunity, an action against the United States must be dismissed for lack of jurisdiction. *United States v. Shaw*, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940); *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). A waiver of immunity must be strictly construed and must be confined to the terms and conditions specified. *Stubbs v. United States*, 620 F.2d 775 (10th Cir. 1980); *Reynolds v. United States*, 643 F.2d 707 (10th Cir.1981).

Section 6001 of RCRA, [42 U.S.C. § 6961], provides in pertinent part:

"*Each department, agency,* and instrumentality *of the executive,* legislative and judicial *branches of the Federal Government* ... engaged in any activity resulting, or which may result, in the disposal or management of solid or hazardous waste *shall comply with all* Federal, *State,* interstate, and local *requirements,* both substantive and procedural (including any requirements for permits or reporting *or any provisions for injunctive relief and such sanctions as may be imposed by a court to enforce such relief),* respecting control and abatement of solid waste or *hazardous waste disposal* in *the same manner,* and to the same extent, *as any person* is subject to such requirements, including the payment of reasonable service charges. *Neither* the *United States, nor any agent, employee, or officer* thereof, *shall be immune or exempt from any process or sanction of any State enforcement* of any *such injunctive relief* . . . ." 42 U.S.C. § 6961. (Emphasis added).

Relevant portions of RCRA § 7002, [42 U.S.C. § 6972] provide as follows:

"(a) In general.

... [A]ny person may commence a civil action on his own behalf—(1)(A) against any person (including (a) the United States, and (b) any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, or order which has become effective pursuant to this Act [42 U.S.C. §§ 6901 et seq.]. . . ."

\*    \*    \*    \*    \*    \*

"(b) Actions prohibited.

\*    \*    \*    \*    \*    \*

(2)(B) No action may be commenced under subsection (a)(1)(B) of this section if the Administrator, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment—

(i) has commenced and is diligently prosecuting an action under section 7003 of this Act [42 U.S.C. § 6973] or under section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C. § 9606],

(ii) is actually engaging in a removal action under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C. § 9604];

(iii) has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C. 9604] and is diligently proceeding with a remedial action under that Act; or

(iv) has obtained a court order (including consent decree) or issued an administrative order under section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or section 7003 of this Act [42 U.S.C. §§ 9606, 6973] pursuant to which a responsible party is diligently conducting a removal action, Remedial Investigation and Feasability Study (RIFS), or proceeding with a remedial action."

The term "person" who is authorized to commence such an action is defined elsewhere to include the State. 42 U.S.C. § 6903(15).

The Army stresses that these sections must be reconciled with certain CERCLA provisions that govern the manner in which federal agencies must undertake CERCLA cleanup actions and which specify the state role in those cleanup efforts. Defendant cites RCRA § 1006, [42 U.S.C. § 6905], in support of its argument that Congress intended that RCRA and CERCLA be integrated to avoid conflicts and to eliminate cleanup duplication. RCRA § 1006, [42 U.S.C. § 6905], states in relevant part:

"(a) Nothing in this Act [42 U.S.C. §§ 6901 et seq.] shall be construed to apply (or to authorize any State, interstate, or local authority to regulate) any activity or substance which is subject to the Federal Water Pollution Control Act ..., the Safe Drinking Water Act ..., the Marine Protection, Research and Sanctuaries Act of 1972 ..., or the Atomic Energy Act of 1954 ..., except to the extent that such application (or regulation) is not inconsistent with the requirements of such Acts."

"(b)(1) The [EPA] Administrator shall integrate all provisions of this Act [42 U.S.C. §§ 6901 et seq.] for purposes of administration and enforcement and shall avoid duplication, to the maximum extent practicable, with the appropriate provisions of the Clean Air Act ..., the Federal Water Pollution Control Act ..., the Federal Insecticide, Fungicide, and Rodenticide Act ..., the Safe Drinking Water Act ..., the Marine Protection, Research and Sanctuaries Act of 1972 ..., and such other Acts of Congress as grant regulatory authority to the Administrator. Such integration shall be effected only to the extent that it can be done in a manner consistent with the goals and policies expressed in this Act ... and in the other acts referred to in this subsection."

RCRA §§ 1006(a) and (b), [42 U.S.C. § 6905(a) and (b)], were enacted as part of the 1976 RCRA amendments to the Solid Waste Disposal Act. The Army asserts that RCRA §§ 1006(a) and (b) do not specifically mention CERCLA because CERCLA was not enacted until 1980. However, the Army does not explain why there has been no amendment to include CERCLA in the list during the intervening eight years.

The issue before me thus concerns whether the provisions of RCRA and CERCLA can be harmoniously construed so as to permit the State to pursue a RCRA suit against the Army seeking enforcement of state hazardous waste cleanup and abatement laws at Basin F at the same

time as other pending actions instituted under CERCLA are addressing the entire Arsenal cleanup. It is undisputed that the plaintiff's action here seeks to enforce, against the Army, *state* hazardous waste management laws and regulations (the CHWMA and regulations promulgated thereunder) administered *"in lieu of"* the federal RCRA program to the extent that the State has been so authorized by the E.P.A. 42 U.S.C. § 6926(b).

At a recent hearing, the State asserted that Basin F, and perhaps other areas within the Arsenal, are RCRA units. On the other hand, the Army contends that the entire Arsenal constitutes an on-going CERCLA cleanup site, and that the E.P.A. is the primary enforcement authority. Basin F still has not been placed on the National Priorities List ("the NPL"), although the Army for years has been assuring this court that it would be so designated. Nevertheless, after much fine-tuning, the main point of the Army's argument is that permitting the State to "carve out" Basin F and proceed under RCRA, separate and apart from the Army's CERCLA cleanup anticipated for the Arsenal as a whole, will defeat CERCLA's aims and frustrate its purpose.

The matter has been further complicated because (1) the Army has not completed a CERCLA Remedial Investigation and Feasibility Study for Basin F, or even for the Arsenal, and the Record of Decision is not expected to be completed until 1993; (2) the Army projected to the State, pursuant to RCRA, that Basin F would be cleaned up and closed by October 1987; and (3) in March 1988, the Army commenced implementing certain "interim response" cleanup measures at Basin F and certain cleanup actions are substantially completed and still underway.

In *United States v. Shell Oil Co.,* 605 F.Supp. 1064 (D.Colo.1985), this court discussed in some detail the overriding purposes for which RCRA and CERCLA were enacted and the goals sought to be accomplished by each statutory scheme. As indicated there, RCRA was enacted to close the regulatory gap that existed because pre-RCRA federal environmental laws did not effectively regulate the disposal of environmental pollutants, including solid and hazardous wastes, on land. That opinion stated:

"RCRA provides for the promulgation of regulations by the [USEPA] applicable to generators of hazardous waste, transporters of hazardous waste, and owners and operators of hazardous waste treatment, storage and disposal facilities. The regulations established requirements respecting, among other things, record keeping practices, labeling practices, use of appropriate containers, use of a manifest system, and the design, construction, operation and maintenance of facilities." *Id.* at 1070.

In *Shell, supra,* I cited a Congressional Report [H.R.Rep. No. 96–1016, 96th Cong., 2d Sess. 22, *reprinted in* 1980 U.S.Code Cong. & Ad.News 6119, 6125] declaring that RCRA was enacted as a prospective "cradle-to-grave" regulatory regime that applies to past sites only to the extent that they are posing an imminent hazard. *Id.*

CERCLA was enacted to clean up inactive hazardous waste disposal sites. It established " 'a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites.' " *Id.* at 1071. CERCLA was enacted to fill the regulatory gap left open by existing law. I further stated in *Shell:*

"[W]hile pre–CERCLA law could prevent further pollution from the contemporary generation and disposal of hazardous wastes, it could not effectively abate the ongoing environmental deterioration resulting from wastes which had been dumped in the past. CERCLA was enacted to address this problem. It is by its very nature backward looking. Many of the human acts that have caused the pollution already had taken place before its enactment; physical and chemical processes are at their pernicious work, carrying destructive forces into the future."

"The decision was made in CERCLA to clean up these inactive hazardous waste sites...." *Id.* at 1072.

Defendant sets forth several policy arguments in support of its contention that CERCLA enforcement and remediation should be given exclusive jurisdiction and preclude RCRA enforcement through the present action. Included in the Army's broad policy arguments are the general assertions (1) that the court should give precedence to CERCLA because it is the more recent, specific statutory scheme for cleaning up hazardous waste contamination at federal facilities; (2) that enforcement under RCRA would disrupt the ongoing cleanup at the Arsenal and would impermissibly duplicate the CERCLA cleanup activities; and (3) that State RCRA enforcement would undermine the goals and policies that Congress set forth in CERCLA. Defendant cites various CERCLA provisions in support of these broad policy arguments.

For example, the State's closure plan and monitoring requirements are effectuated through a state permit process. In contrast, CERCLA § 121(e)(1), [42 U.S.C. § 9621(e)(1)], exempts CERCLA sites from having to acquire state or federal permits for remedial action conducted on site. Thus, the Army contends, the delays incurred in obtaining permits for RCRA enforcement would frustrate Congress's intent in enacting CERCLA as an effort to "speed up" the cleanup process. (I note that the instant CERCLA action has been pending since December 1983, and despite the court's frequent cajoling, the parties have constantly delayed efforts to bring the case to trial; nor have they proposed an overall plan for clean up as contemplated by CERCLA).

The Army further argues that the State's interest in having its administrative requirements satisfied with respect to Basin F are protected. In support of this argument, the Army relies on CERCLA § 121(d), [42 U.S.C. § 9621(d)], which provides that a State's environmental standards, including state RCRA requirements, shall be considered in determining the level of cleanup at a CERCLA site and will be applied to the extent that they are applicable, relevant and appropriate ("ARAR"). At nearly every hearing, however, the State has complained that it is being left out of the process and by-passed in decisions made by the Army and the EPA.

Next, the Army asserts, the Arsenal has been listed on the National Priorities List ("the NPL"), and Basin F has been proposed for listing and should be placed on the NPL "early in 1988." It is now February 1989. Pursuant to CERCLA § 120, [42 U.S.C. § 9620], the Army argues, the E.P.A., not the State of Colorado, is ultimately responsible for overseeing and approving all Arsenal cleanup activities. However, neither party has advised the court that Basin F has been listed on the NPL.

The Army contends that it began its CERCLA Remedial Investigation and Feasibility Study at the Arsenal in October 1984. The interim remedial action plan for Basin F was proposed in June 1986 and transmitted to the State on December 4, 1987. The Army's brief also outlines the interim response actions taken with respect to the Arsenal and Basin F. Defendant Army argues that the cleanup of the Arsenal and Basin F are "inextricably related."

Last, argues the Army, once a CERCLA cleanup is underway, the State's participation rights are defined and governed by CERCLA. CERCLA § 120(f), [42 U.S.C. § 9620(f)], affords the State the opportunity to participate in the planning and selection of remedial action. CERCLA § 121(f), [42 U.S.C. § 9621(f)], outlines the State's right to participate in the cleanup remedy selection process and to seek review of the remedy selected. As indicated above, pursuant to CERCLA § 121(d) and (e)(2), [42 U.S.C. §§ 9621(d) and (e)(2)], the State may seek compliance with its own standards, such as permit requirements or other administrative requirements, if it is concerned that the CERCLA cleanup will not ensure adequate protection. The statute sets forth procedure the State can utilize to challenge judicially the United States' re-

medial action plan prior to its implementation. CERCLA § 121(f)(3)(B), [42 U.S.C. § 9621(f)(3)(B)].

Similarly, CERCLA §§ 117, [42 U.S.C. § 9617)], and 113(k), [42 U.S.C. § 9613(k)], provide for public participation in the clean-up process by providing an opportunity for the public to submit written and oral comments, and to have a public meeting near the facility. RCRA, in contrast, does not provide for formal public participation.

In assessing the defendant's arguments, I first must examine other relevant CERCLA provisions.

CERCLA § 114(a), [42 U.S.C. § 9614(a)], states:

"(a) Nothing in this Act shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State."

Additionally, CERCLA § 302(d), [42 U.S.C. § 9652(d)], provides in pertinent part:

"(d) Nothing in this Act shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants...."

Even more explicitly, CERCLA § 120, part of SARA, [42 U.S.C. § 9620] states in pertinent part:

"(a)(1) Each department, agency, and instrumentality of the United States (including the executive, legislative, and judicial branches of government) shall be subject to, and comply with, this Act in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 107 of this Act [42 U.S.C. § 9607]. Nothing in this section shall be construed to affect the liability of any person or entity under sections 106 and 107 [42 U.S.C. §§ 9606 and 9607]."

\*     \*     \*     \*     \*     \*

"(a)(4) State laws concerning removal and remedial action, including State laws regarding enforcement, shall apply to removal and remedial action at facilities owned or operated by a department, agency, or instrumentality of the United States when such facilities *are not included* on the National Priorities List. The preceding sentence shall not apply to the extent a State law would apply any standard or requirement to such facilities which is more stringent than the standards and requirements applicable to facilities which are not owned or operated by any such department, agency or instrumentality." (Emphasis added).

\*     \*     \*     \*     \*     \*

"(i) Nothing in this section shall affect or impair the obligation of any department, agency, or instrumentality of the United States to comply with any requirement of the Solid Waste Disposal Act [42 U.S.C. §§ 6901 et seq.] (including corrective action requirements)."

Tenets of statutory construction provide that whenever a legislative body enacts a statute, it has in mind previous statutes relating to the same subject matter. The new provision is presumed to be in accord with the legislative policy embodied in prior statutes and all statutes should be construed together. 2A *Sutherland Statutory Construction* § 51.02 (Sands 4th ed.). As I emphasized in *Shell*, "... CERCLA must be construed in light of previous statutes relating to environmental pollution, ...," and notably, that includes RCRA. *Shell*, 605 F.Supp. at 1070.

■ Nothing in the cited statutes indicates that a CERCLA action should take precedence over a RCRA enforcement action. On the contrary, it appears that CERCLA was intended to operate independently of and in addition to RCRA, and that the statutory schemes are not mutually exclusive. *See Mardan Corp. v. C.G.C. Music, Ltd.*, 600 F.Supp. 1049 (D.Ariz.1984) *aff'd* 804 F.2d 1454 (9th Cir.1986).

In fact, CERCLA § 120(a)(4), [42 U.S.C. § 9620(a)(4)], preserves state enforcement actions at federal facilities that are not listed on the National Priorities List. CERCLA § 120(i), [42 U.S.C. 9620(i)], re-

quires the federal government to comply with the Solid Waste Disposal Act, and now RCRA, whether or not the facility is listed on the NPL. It is undisputed that Basin F is not listed on the NPL.

I realize that CERCLA was enacted after RCRA. However, I cannot read a conflict into statutes enacted on the same subject matter where none exists. Nor can I supply an amendment to a statute that Congress has chosen not to amend for over eight years.

The Army was one of the active polluters at Basin F. The Army thus is jointly and severally liable for the contamination at Basin F and its alleged harmful impact on the community that borders the Arsenal. Were I to dismiss this action, the Army's cleanup efforts would go unchecked by any parties whose interest are in any real sense adverse to those of the Army. The same Justice Department attorneys have repeatedly claimed to represent both the Army and the E.P.A. in this action, even though the Army is a defendant and the E.P.A. acts for the United States as a plaintiff. These Justice Department lawyers repeatedly have rejected this court's suggestions that representing these opposing parties constitutes a conflict of interest.

Since it is the E.P.A.'s job to achieve a clean up as quickly and thoroughly as possible, and since the Army's obvious financial interest is to spend as little money and effort as possible on the cleanup, I cannot imagine how one attorney can vigorously and wholeheartedly advocate both positions. For this reason, among others, I have been reluctant to approve the proposed "consent decree," which is fundamentally an agreement between the two polluters, the Army and Shell, to restrict future uses of Arsenal land and thereby limit cleanup standards, thus lowering costs for both defendants.

The Army, in effect, seeks full and unbridled discretion, subject only to E.P.A.'s input through the same attorneys who represent the Army, to regulate the Basin F cleanup, a process that has been ongoing for more than five years and is still nowhere near completion or resolution.

CERCLA was enacted to "speed up" the cleanup process, not delay it.

Moreover, once the Army has satisfied what it considers to be its cleanup obligations, the State is responsible to its citizens if the process has not been thorough. Having the State actively involved as a party would guarantee the salutary effect of a truly adversary proceeding that would be more likely, in the long run, to achieve a thorough cleanup.

Sites like the Arsenal, and especially Basin F, must be considered in the long range perspective of generations yet unborn and centuries still far over time's horizon. Indeed, if the instant CERCLA action fails to achieve an adequate cleanup, it is the people of Colorado who ultimately must pay either the price of cleanup, or the price of not cleaning up this, the worst hazardous and toxic waste site in America. It is not inappropriate that the present and future victims of this poison legacy, left in their midst by the Army and Shell, should have a meaningful voice in its cleanup. In RCRA, Congress has plainly provided them that voice through representation by the State. I hold that RCRA enforcement by the State is not precluded by CERCLA in the circumstances here presented.

I conclude that the E.P.A.'s potential monitoring of the Army's Basin F cleanup operation under CERCLA does not serve as an appropriate or effective check on the Army's efforts. As long as both of these federal agencies are represented in the Arsenal CERCLA actions by the same Justice Department lawyers who have professed that they have no conflict of interest, even though one of their clients is a plaintiff and another a defendant in the same consolidated action, there is no vigorous independent advocate for the public interest.

■ As an additional argument, the defendant asserts that the instant action is barred by sovereign immunity because the state regulatory standards sought to be applied are not precise or objective, and are ill-suited for uniform application. Defendant contends that RCRA § 6001, [42 U.S. C. § 6961], must be strictly construed and does not extend to circumstances in which

the state has failed to promulgate objective and ascertainable regulations by which federal compliance can be fairly gauged. In support, the defendant cites *State of Fla. Dept. of Environmental Regulation v. Silvex Corp.*, 606 F.Supp. 159 (M.D.Fla. 1985) and *Kelly v. United States*, 618 F.Supp. 1103 (W.D.Mich.1985).

In *Silvex*, the State of Florida sued the United States Navy, among other defendants, asserting a claim for negligently releasing hazardous waste materials in violation of certain state statutes that permitted the State to take emergency action when the spillage of hazardous waste material posed an imminent threat to public health, safety and welfare. Florida contended that the Navy had consented to be sued under RCRA § 6001, [42 U.S.C. § 6961]. The Navy moved for dismissal on the ground that the state statutes sought to be enforced were not "requirements" as envisioned by Congress in RCRA § 6001, [42 U.S.C. § 6961]. The Army's argument in the instant case tracks the Navy's argument in the *Silvex* case.

In her analysis of the issue, Judge Black reviewed RCRA's legislative history and similar sovereign immunity waiver provisions contained in analogous federal environmental laws. The district court's opinion stated, in pertinent part:

"A legislative report discussing the pre–RCRA bill then before the Senate indicates the RCRA was intended to force federal agencies dealing with hazardous waste '*to comply with State and local controls* on solid waste and hazardous waste disposal as if they were private citizens.' This includes compliance with all substantive and procedural requirements, '*and specifically any requirements to obtain permits.*' Senate Report No. 94–988, 70th Cong., 2nd Session, at 24 (1976); 122 Cong.Rec. 32,631 (Sept. 27, 1976). The requirements referred to in the Senate report are more in the nature of regulatory guidelines and ascertainable standards that a federal agency dealing with hazardous waste would have to meet."

"Senate Report No. 94–988 further states that section 6961 parallels the waiver provision of the Clean Air Act, 42 U.S.C. § 7418, and the Federal Water Pollution Control Act, 33 U.S.C. § 1323.... The legislative history of these provisions demonstrates a similar intent to have requirements defined as objective state standards of control...."

"The courts interpreting requirements as used in federal environmental legislation have also limited the term to a state's regulatory requirements. Courts reviewing the waiver provisions of the Clean Air Act, the FWPA [Federal Water Pollution Act], and the Noise Control Act, 42 U.S.C. § 4903(b), the language of which, ..., directly parallels section 6961, consistently have held that requirements is a limited term which cannot be expanded to include the kinds of state law liability provisions that the [State] relies on in this case...." (citations omitted).

* * * * * *

"... To achieve uniformity and consistency in state environmental regulation, sovereign immunity is partially waived to require federal entities to comply with state standards. This narrow intrusion into federal sovereign immunity has required that courts strictly define requirements as objective and ascertainable state regulations; e.g., state pollution standards or limitations, compliance schedules, emissions standards, and control requirements...." (citations omitted). *Id.* at 162–163.

The district court concluded that RCRA's legislative history and certain analogous federal statutes containing similar immunity waiver provisions have strictly defined "requirements" as synonymous with state objective regulations. Florida's action against the Navy was dismissed because the state statutes failed to set forth the specific, precise standards intended by the term "requirements" contained in RCRA § 6001, [42 U.S.C. § 6961].

The case of *Kelly v. United States, supra*, is similar. There the district court considered the waiver provision contained

in the Federal Water Pollution Control Act, 33 U.S.C. § 1323(a), in the context of state claims under Michigan's water and environmental laws being asserted against a federal agency. The court dismissed the state claims because the state statutes did not provide "objective, quantifiable standards subject to uniform application." *Kelly,* 618 F.Supp. at 1108.

I have set forth in an appendix to this order the pertinent state regulations that apply to this action, including the regulations the Army has allegedly violated. As emphasized by the State in its brief, these regulations track, almost verbatim, the federal regulations promulgated by E.P.A., pursuant to RCRA, that already apply to all federal agencies. *Compare* 6 CCR 1007–3, Subpart F, §§ 265.90 through 265.-94 with 40 C.F.R. Part 265, Subpart F, §§ 265.90 through 265.94. Based on my review of these state regulations, I find and conclude that they set forth sufficiently specific and precise standards, subject to uniform application, to satisfy the term "requirements" as used in RCRA § 6001, [42 U.S.C. § 6961].

As can be clearly seen, RCRA § 6001, [42 U.S.C. § 6961], is all-encompassing since it provides that federal facilities are subject to "all Federal, State, Interstate, and local requirements, both substantive and procedural...." Giving the words used their plain, ordinary meaning, it is difficult to imagine a clearer statement of legislative intent: federal facilities such as Basin F at the Rocky Mountain Arsenal are subject to state and local requirements respecting the treatment and disposal of hazardous waste provided that those state and local requirements set out specific and precise standards subject to uniform application. Having found that the Colorado regulations satisfy these standards, I conclude that the Army's motion to dismiss based on this argument must be denied.

Accordingly, it is ORDERED that the defendant's motion to dismiss the First Amended Complaint, or in the alternative for summary judgment or partial summary judgment, is denied.

The plaintiff State of Colorado is ORDERED to amend to update its pending Motion for Preliminary Injunction and Motion for Partial Summary Judgment within 11 days, if it desires to do so, and apply for an expedited hearing specifying which issues remain for decision.

## APPENDIX

Code of Colorado Regulations

6 CCR 1007–3

265.77 Additional reports.

In addition to submitting the annual report and unmanifested waste reports described in 265.75 and 265.76, the owner or operator must also report to the Department;

(a) Releases, fires, and explosions as specified in § 265.56(j);

(b) Ground-water contamination and monitoring data as specified in §§ 265.93 and 265.94; and

(c) Facility closure as specified in § 265.115.

Subpart F—Ground–Water Monitoring

265.90 Applicability.

(a) The owner or operator of a surface impoundment, landfill, or land treatment facility which is used to manage hazardous waste must implement a ground-water monitoring program capable of determining the facility's impact on the quality of ground water in the uppermost aquifer underlying the facility, except as § 265.1 provides otherwise.

(b) Except as paragraph (d) of this section provides otherwise, the owner or operator must install, operate, and maintain a ground-water monitoring system which meets the requirements of § 265.91, and must comply with §§ 265.92–265.94. This ground-water monitoring program must be carried out during the active life of the facility, and for disposal facilities, during the post-closure care period as well.

(c) [Reserved]

(d) If an owner or operator assumes (or knows) that ground-water monitoring of indicator parameters in accordance with

§§ 265.91 and 265.92 would show statistically significant increases (or decreases in the case of pH) when evaluated under § 265.93(b), he may, install, operate, and maintain an alternate ground-water monitoring system (other than the one described in §§ 265.91 and 265.92). If the owner or operator decides to use an alternate ground-water monitoring system he must:

(1) Submit to the Department a specific plan, certified by a qualified geologist or geotechnical engineer, which satisfies the requirements of § 265.93(d)(3), for an alternate groundwater monitoring system;

(2) Initiate the determinations specified in § 265.93(d)(4);

(3) Prepare and submit a written report in accordance with § 265.93(d)(5);

(4) Continue to make the determinations specified in § 265.93(d)(4) on a quarterly basis until final closure of the facility; and

(5) Comply with the recordkeeping and reporting requirements in § 265.94(b).

(e) The ground-water monitoring requirements of this Subpart may be waived with respect to any surface impoundment that (1) is used to neutralize wastes which are hazardous solely because they exhibit the corrosivity characteristic under § 261.22 of these regulations or are listed as hazardous wastes in Subpart D of Part 261 of these regulations only for this reason, and (2) contains no other hazardous wastes, if the owner or operator can demonstrate that there is no potential for migration of hazardous wastes from the impoundment. The demonstration must establish, based upon consideration of the characteristics of the wastes and the impoundment, that the corrosive wastes will be neutralized to the extent that they no longer meet the corrosivity characteristic before they can migrate out of the impoundment. The demonstration must be in writing and must be certified by a qualified professional.

265.91  Ground-water monitoring system.

(a) A ground-water monitoring system must be capable of yielding ground-water samples for analysis and must consist of:

(1) Monitoring wells (at least one) installed hydraulically upgradient (i.e., in the direction of increasing static head) from the limit of the waste management area. Their number, locations, and depths must be sufficient to yield ground-water samples that are:

(i) Representative of background ground-water quality in the uppermost aquifer near the facility; and

(ii) Not affected by the facility; and

(2) Monitoring wells (at least three) installed hydraulically downgradient (i.e., in the direction of decreasing static head) at the limit of the waste management area. Their number, locations, and depths must ensure that they immediately detect any statistically significant amounts of hazardous waste or hazardous waste constituents that migrate from the waste management area to the uppermost aquifer.

(b) Separate monitoring systems for each waste management component of a facility are not required provided that provisions for sampling upgradient and downgradient water quality will detect any discharge from the waste management area.

(1) In the case of a facility consisting of only one surface impoundment, landfill, or land treatment area, the waste management area is described by the waste boundary (perimeter).

(2) In the case of a facility consisting of more than one surface impoundment, landfill, or land treatment area, the waste management area is described by an imaginary boundary line which circumscribes the several waste management components.

(c) All monitoring wells must be cased in a manner that maintains the integrity of the monitoring well bore hole. This casing must be screened or perforated, and packed with gravel or sand where necessary, to enable sample collection at depths where appropriate aquifer flow zones exist. The annular space (i.e., the space between the bore hole and well casing) above the sampling depth must be sealed with a suitable material (e.g., cement grout or bentonite slurry) to prevent contamination of samples and the ground water.

265.92  Sampling and analysis.

(a) The owner or operator must obtain and analyze samples from the installed ground-water monitoring system. The owner or operator must develop and follow a ground-water sampling and analysis plan. He must keep this plan at the facility. The plan must include procedures and techniques for:

(1) Sample collection;

(2) Sample preservation and shipment;

(3) Analytical procedures; and

(4) Chain of custody control

(b) The owner or operator must determine the concentration or value of the following parameters in ground-water samples in accordance with paragraphs (c) and (d) of this section:

(1) Parameters characterizing the suitability of the ground water as a drinking water supply, as specified in Appendix III.

(2) Parameters establishing ground-water quality:

(i) Chloride

(ii) Iron

(iii) Manganese

(iv) Phenols

(v) Sodium

(vi) Sulfate

(3) Parameters used as indicators of ground-water contamination:

(i) pH

(ii) Specific Conductance

(iii) Total Organic Carbon

(iv) Total Organic Halogen

(c)(1) For all monitoring wells, the owner or operator must establish initial background concentrations or values of all parameters specified in paragraph (b) of this section. He must do this quarterly for one year.

(2) For each of the indicator parameters specified in paragraph (b)(3) of this section, at least four replicate measurements must be obtained for each sample and the initial background arithmetic mean and variance must be determined by pooling the replicate measurements for the respective parameter concentrations or values in samples obtained from upgradient wells during the first year.

(d) After the first year, all monitoring wells must be sampled and the samples analyzed with the following frequencies:

(1) Samples collected to establish ground-water quality must be obtained and analyzed for the parameters specified in paragraph (b)(2) of this section at least annually.

(2) Samples collected to indicate ground-water contamination must be obtained and analyzed for the parameters specified in paragraph (b)(3) of this section at least semi-annually.

(e) Elevation of the ground-water surface at each monitoring well must be determined each time a sample is obtained.

265.93 Preparation, evaluation, and response.

(a) The owner or operator must prepare an outline of a ground-water quality assessment program. The outline must describe a more comprehensive ground-water monitoring program (than that described in § 265.91 and § 265.92) capable of determining:

(1) Whether hazardous waste or hazardous waste constituents have entered the ground water:

(2) The rate and extent of migration of hazardous waste or hazardous waste constituents in the ground water; and

(3) The concentrations of hazardous waste or hazardous waste constituents in the ground water.

(b) For each indicator parameter specified in § 265.92(b)(3), the owner or operator must calculate the arithmetic mean and variance, based on at least four replicate measurements on each sample, for each well monitored in accordance with § 265.92(d)(2), and compare these results with its initial background arithmetic mean. The comparison must consider individually each of the wells in the monitoring system, and must use the Student's t-test at the 0.01 level of significance (see Appendix IV) to determine statistically significant in-

creases (and decreases, in the case of pH) over initial background.

(c)(1) If the comparisons for the upgradient wells made under paragraph (b) of this Section show a significant increase (or pH decrease), the owner or operator must submit this information in accordance with § 265.94(a)(2)(ii).

(2) If the comparisons for downgradient wells made under paragraph (b) of this Section show a significant increase (or pH decrease), the owner or operator must then immediately obtain additional ground-water samples from those downgradient wells where a significant difference was detected, split the samples in two, and obtain analyses of all additional samples to determine whether the significant difference was a result of laboratory error.

(d)(1) If the analyses performed under paragraph (c)(2) of this section confirm the significant increase (or pH decrease), the owner or operator must provide written notice to the Department—within seven days of the date of such confirmation—that the facility may be affecting ground-water quality.

(2) Within 15 days after the notification under paragraph (d)(1) of this section, the owner or operator must develop and submit to the Department a specific plan, based on the outline required under paragraph (a) of this Section and certified by a qualified geologist or geotechnical engineer, for a ground-water quality assessment program at the facility.

(3) The plan to be submitted under § 265.90(d)(1) or paragraph (d)(2) of this section must specify:

(i) The number, location, and depth of wells;

(ii) Sampling and analytical methods for those hazardous wastes or hazardous waste constituents in the facility:

(iii) Evaluation procedures, including any use of previously-gathered ground-water quality information; and

(iv) A schedule of implementation.

(4) The owner or operator must implement the ground-water quality assessment plan which satisfies the requirements of paragraph (d)(3) of this section, and, at a minimum determine;

(i) The rate and extent of migration of the hazardous waste or hazardous waste constitutents in the ground water; and

(ii) The concentrations of the hazardous waste or hazardous waste constituents in the ground water.

(5) The owner or operator must make his first determination under paragraph (d)(4) of this section as soon as technically feasible, and, within 15 days after that determination, submit to the Department a written report containing an assessment of the ground-water quality.

(6) If the owner or operator determines, based on the results of the first determination under paragraph (d)(4) of this Section, that no hazardous waste or hazardous waste constituents from the facility have entered the ground-water, then he may reinstate the indicator evaluation program described in § 265.92 and paragraph (b) of this Section. If the owner or operator reinstates the indicator evaluation program, he must so notify the Department in the report submitted under paragraph (d)(5) of this Section.

(7) If the owner or operator determines, based on the first determination under paragraph (d)(4) of this section, that hazardous waste or hazardous waste constituents from the facility have entered the ground water, then he:

(i) Must continue to make the determinations required under paragraph (d)(4) of this section on a quarterly basis until final closure of the facility, if the ground-water quality assessment plan was implemented prior to final closure of the facility; or

(ii) May cease to make the determinations required under paragraph (d)(4) of this section, if the ground water quality assessment plan was implemented during the post-closure care period.

(e) Notwithstanding any other provision of this subpart, any ground-water quality assessment to satisfy the requirements of § 265.93(d)(4) which is initiated prior to final closure of the facility must be complet-

ed and reported in accordance with § 265.93(d)(5).

(f) Unless the ground water is monitored to satisfy the requirements of § 265.93(d)(4), at least annually the owner or operator must evaluate the data on ground-water surface elevations obtained under § 265.92(e) to determine whether the requirements under § 265.91(a) for locating the monitoring wells continues to be satisfied. If the evaluation shows that § 265.91(a) is no longer satisfied, the owner or operator must immediately modify the number, location, or depth of the monitoring wells to bring the ground-water monitoring system into compliance with this requirement.

265.94  Recordkeeping and reporting.

(a) Unless the ground-water is monitored to satisfy the requirements of § 265.93(d)(4), the owner or operator must:

(1) Keep records of the analyses required in § 265.92(c) and (d), the associated ground-water surface elevations required in § 265.92(e), and the evaluations required in § 265.93(b) throughout the active life of the facility, and, for disposal facilities, throughout the post-closure care period as well; and

(2) Report the following ground-water monitoring information to the Department:

(i) During the first year when initial background concentrations are being established for the facility: concentrations or values of the parameters listed in § 265.92(b)(1) for each ground-water monitoring well within 15 days after completing each quarterly analysis. The owner or operator must separately identify for each monitoring well any parameters whose concentration or value has been found to exceed the maximum contaminant levels listed in Appendix III.

(ii) Annually: Concentrations or values of the parameters listed in § 265.92(b)(3) for each ground-water monitoring well, along with the required evaluations for these parameters under § 265.93(b). The owner or operator must separately identify any significant differences from initial background found in the upgradient wells,

in accordance with § 265.93(c)(1). During the active life of the facility, this information must be submitted no later than March 1 following each calender year.

(iii) No later than March 1 following each calendar year: results of the evaluation of ground-water surface elevations under § 265.93(f), and a description of the response to that evaluation, where applicable.

(b) If the ground water is monitored to satisfy the requirements of § 265.93(d)(4), the owner or operator must:

(1) Keep records of the analyses and evaluations specified in the plan, which satisfies the requirements of § 265.93(d)(3), throughout the active life of the facility, and, for disposal facilities, throughout the post-closure care period as well; and

(2) Annually, until final closure of the facility, submit to the Department a report containing the results of his/her ground-water quality assessment program which includes, but is not limited to, the calculated (or measured) rate of migration of hazardous waste or hazardous waste constituents in the ground-water during the reporting period. This information must be submitted no later than March 1 following each calendar year.

Subpart G—Closure and Post Closure

265.110  Applicability.

Except as § 265.1 provides otherwise:

(a) Sections §§ 265.111–265.115 (which concern closure) apply to the owners and operators of all hazardous waste management facilities; and

(b) Sections §§ 265.116–265.120 (which concern post-closure care) apply to the owners and operators of:

(1) All hazardous waste disposal facilities; and

(2) Waste piles and surface impoundments for which the owner or operator intends to remove the wastes at closure to the extent that these Sections are made applicable to such facilities in Sections 265.-228 and 265.258.

265.111  Closure performance standard.

The owner or operator must close his facility in a manner that:

(a) Minimizes the need for further maintenance, and

(b) Controls, minimizes or eliminates, to the extent necessary to protect human health and the environment, post-closure escape of hazardous waste, hazardous constituents, leachate, contaminated runoff, or hazardous waste decomposition products to the ground or surface waters or to the atmosphere, and

(c) Complies with the closure requirements of this Subpart including, but not limited to, the requirements of Sections 265.197, 265.228, 265.258, 265.280, 265.310, 265.351, 265.381 and 265.404.

265.112 Closure plan; amendment of plan.

(a) Written plan.

By May 19, 1981, the owner or operator of a hazardous waste management facility must have a written closure plan. Until final closure is completed and certified in accordance with Section 265.115, a copy of the most current plan must be furnished to the Department upon request, including request by mail. In addition, for facilities without approved plans, it must also be provided during site inspections, on the day of inspection, to any officer, employee or representative of the Department who is duly designated by the Director.

(b) Content of plan.

The plan must identify the steps necessary to perform partial and/or final closure of the facility at any point during its active life. The closure plan must include, at least:

(1) A description of how each hazardous waste management unit at the facility will be closed in accordance with Section 265.-111; and

(2) A description of how final closure of the facility will be conducted in accordance with Section 265.111. The description must identify the maximum extent of the operations which will be unclosed during the active life of the facility; and

(3) An estimate of the maximum inventory of hazardous wastes ever on-site over the active life of the facility and a detailed description of the methods to be used during partial closures and final closure, including, but not limited to, methods for removing, transporting, treating, storing, or disposing of all hazardous wastes, and identification of the type(s) of the off-site hazardous waste management units to be used, if applicable; and

(4) A detailed description of the steps needed to remove or decontaminate all hazardous waste residues and contaminated containment